Winfred H. BONNER, Plaintiff,

v.

The TEXAS CITY INDEPENDENT SCHOOL DISTRICT OF Texas City, TEXAS; Dave Engman, Superintendent; H. W. McAnich, John C. Gee, J. B. Wimberly, W. L. Johnson, Ed Staggs, Dr. Charles Rohden, Board Members, Defendants.

Civ. A. No. 65–G–56.

United States District Court
S. D. Texas,
Galveston Division.

Sept. 2, 1969.

Jack Greenberg, James M. Nabrit, III, and Conrad K. Harper, of NAACP Legal Defense and Educational Fund, Inc., New York City, and M. W. Plummer, Houston, Tex., for plaintiff.

Neugent & Lilienstern, Holman Lilienstern, Texas City, Tex., for defendant.

## SUPPLEMENTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

NOEL, District Judge.

### I. PREFACE

Plaintiff, a Negro, was not rehired by the defendant Texas City Independent School District ("the District") for the 1965–1966 school year. He brought this action against the District, its Superintendent, and several members of its Board of Trustees ("the Board") alleging that his rights under the Fourteenth Amendment to due process of law and equal protection of the laws had been violated. Later, plaintiff obtained leave of Court and amended his complaint to demand relief, pursuant to Rule 23(b) (2), F.R.Civ.P., not only for himself individually but also as the representative of all Negro teachers similarly situated. Jurisdiction is alleged under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 and is not challenged by defendants.

On his own behalf plaintiff seeks (1) an injunction requiring defendants (a) to offer him a teaching contract for the 1965–1966 school year in accordance with his claimed qualifications and experience and without regard to race or color, (b) to maintain their contractual relation with him in subsequent years on the same basis, and (c) to refrain from maintaining any policy of discrimination against him because of his race or color, (2) punitive damages, and (3) reasonable attorneys' fees. On behalf of himself and his class he seeks back pay. By stipulation at trial, all issues as to attorneys' fees and damages were severed pursuant to Rule 42(b), F.R.Civ.P.

The Court has entered a pre-trial order in this case, agreed to by the parties, specifying a single fact issue:

Did defendants refuse to re-employ plaintiff to teach at the integrated Texas City High School because of his race or color, pursuant to a policy or plan not to permit Negro teachers to teach white students?

Although broad, this issue was not broad enough to encompass the class action claim added to the complaint after the pre-trial order was entered; amendment of the order was not sought. Plaintiff nevertheless offered evidence with respect to both claims without objection, and after the trial requested leave to amend his complaint further to allege that he had been denied due process of law by the procedures used by defendants in not rehiring him.

The District's defense is that it refused to rehire plaintiff because he was a poor teacher and because he had failed to work harmoniously with his superiors, not because of his race nor as an effect of the integration then in progress. The District also moved to dismiss the complaint for failure to state a claim upon which relief could be granted and for plaintiff's failure to exhaust the administrative remedies provided by state law. Additionally, it moved to strike the class action aspects of the amended complaint.

The evidence adduced in a seven-day trial to the Court was not favorable to plaintiff. To the contrary, it so clearly supported the defense as to cause this Court to conclude that defendants proved, not only by a preponderance of the evidence but beyond a reasonable doubt, that plaintiff's race had nothing to do with the Board's decision that he was unfit to continue as a teacher. Plaintiff did not offer a scintilla of evidence which the Court considered of probative force on the affirmative side of the single issue agreed to by the parties in the pre-trial order.

At the trial extensive evidence was heard concerning the District's experience with desegregation, plaintiff's relations with his principal and his other administrative superiors, and the procedure by which the Board determined not to rehire him for the 1965–1966 school year. After stating its findings on each of these issues, the Court will make conclusions of law as follows:

(1) The Court has jurisdiction of the claim and over all parties, but plaintiff

has failed to state a claim upon which relief can be granted against any except the individual defendants in their individual capacities.

(2) This case is not a proper class action, and defendants' motion to strike the class action allegations in the amended complaint should be granted.

(3) The motion to amend the complaint to conform to the evidence should be denied.

(4) Plaintiff was not denied due process of law or equal protection of the laws because of his race, as a result of the integration of the District, or by virtue of the procedures used by the Board in considering whether to rehire him.

(5) Plaintiff's request for an injunction should be denied.

(6) The motion to dismiss should be granted.

A jury having been waived by the parties and the Court having heard the evidence, arguments and re-arguments of counsel, and having had the assistance of extensive briefing by the opposing counsel, has found as facts and arrived at conclusions of law as follows:

## II. FINDINGS OF FACT

(1) The plaintiff, Winfred H. Bonner, is a 47-year-old citizen of the United States and of Texas, holding a B. A. degree, and he is certified by the State of Texas to teach grades 1–12, speech pathology, and the mentally retarded. Plaintiff has had post-graduate work in his specialities at Tillson College, Prairie View A & M College, University of Texas, San Francisco State College, Germerson Western State College in Colorado, University of Denver, Our Lady of the Lake at San Antonio, and Northwestern University.

(2) The Texas City Independent School District is governed by a Board of Trustees which operates and maintains a system of public schools within the boundaries of the District, located in Galveston County, Texas. Board members are elected officials who serve without pay.

(3) B. R. Brooks was Superintendent of Schools for the District from 1950 until his resignation in 1963. His successor was Dr. Edsell F. Bittick, who served during the 1963–1964 school year. Upon his resignation, J. D. King became Superintendent and served until his death in August 1965. He was succeeded by Dr. J. D. Engman, who has served from January 1966 to the present.

(4) During the 20 years preceding the trial of this cause, there had never been any manifestation in the District of racial violence or hatred between Whites and Negroes, such as race riots, or civil rights marches or demonstrations.

(5) Prior to the 1963–1964 school year, the District had operated a number of schools for White pupils, as well as the Booker T. Washington School, a 12-grade school for Negro pupils.

(6) Within six months after the Supreme Court decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954), the President of the Board appointed a bi-racial study committee, which recommended that the community, Negro as well as White, be educated as to the necessity for school desegregation. This recommendation was implemented by contacting ministers, giving speeches to church groups, and exchanging pastors between churches.

(7) In 1959 the President of the Board appointed a second bi-racial study committee to investigate and determine whether integration was feasible, and if so, to develop a plan of desegregation. The committee reported a plan of desegregation back to the Board which, with two modifications, was accepted by the Board.

(8) The Board would have implemented the modified plan of desegregation without judicial intervention but for a state law providing for the termination of all state school aid if schools were desegregated without a referendum. No referendum was held. It had already been established from the work of the bi-racial

committees that the community favored desegregation.

(9) By pre-arrangement between the parties, on August 8, 1961, a number of Negro pupils and their parents filed suit in this Court against the District, the Board, its members, and others seeking desegregation of schools in the District. Evans v. Brooks, Civil No. 2803 (Galveston Div., S.D.Tex.). On April 10, 1962, this Court entered a judgment based on the report of the 1959 study committee, as modified by the Board. This judgment was drawn and agreed to by counsel for all parties, and was presented to the Court as an agreed judgment. No hearing or trial was had in the case. The judgment permanently enjoined segregation of the races in any school of the District and prescribed a plan of desegregation for all schools in the District. The prescribed schedule of desegregation commenced with the 12th, 11th, and 10th grades for the 1963–1964 school year, and continued for an additional grade each succeeding year from the 9th to 1st grades, until the entire system had been desegregated. Although the judgment expressly provided that "this action shall be retained on the docket for such further proceedings and orders as may be appropriate to effectuate this judgment," no further motion has been filed or order entered in the case concerning any aspect of desegregation or integration of the Texas City school system.

(10) The District complied with the judgment by affording all 10th, 11th, and 12th grade pupils, at the beginning of the 1963–1964 school year, the freedom of choosing whether to attend the formerly all-Negro Booker T. Washington High School or the formerly all-White Texas City High School. Thereafter, as each grade was desegregated, all pupils in the District were permitted to enroll in the desegregated grades to which they were eligible in the school or schools of their choice.

(11) Under the plan and timetable set forth in the judgment, complete desegregation was to have been effected at the beginning of the 1972–1973 school year. However, desegregation in the District has proceeded substantially more rapidly than required by the judgment. No difficulties of any consequence have arisen in or resulted from desegregation.

(12) Early in the 1964–1965 school year it became apparent that the high school department of the Booker T. Washington School, but not the elementary or junior high departments, would have to be closed because the number of students enrolled in the high school had dropped so far that it was not feasible to operate it as a well-rounded high school. The Board decided to close the high school department of the Booker T. Washington School at the beginning of the 1965–1966 school year and to require all students in those grades to attend the Texas City High School.

(13) Neither the complaint filed in the Evans case in 1961, nor the judgment entered in 1962, contained any express reference to faculty desegregation, although this was impliedly covered in the pleadings and judgment. The Board never adopted a formal plan of faculty desegregation. However, in 1960 the Board adopted a statement of policy giving the Superintendent full responsibility for hiring, rehiring, and transferring faculty. This policy was in effect but not challenged when the complaint was filed and judgment entered in Evans. This policy statement did not mention race, but after desegregation began it was interpreted by the Board and the administration to give the Superintendent the authority and duty to desegregate faculties by means of transfers or otherwise.

(14) The Board orally encouraged each Superintendent to desegregate the District's faculty. It had instructed Superintendent King to evaluate all teachers in the system on an objective and fair basis with a view toward assigning as many qualified Negro teachers as possible to teach in formerly all-White schools during the 1965–1966 school year. King developed a plan of

faculty desegregation to commence in the fall of 1965, but he died before it could be implemented. There was no policy of any kind, Board or administrative, restricting the opportunity of Negro teachers to teach White students. The administration intended to desegregate the District's faculty as soon as it was possible to do so. During the 1966–1967 school year five Negro teachers were teaching at formerly all-White schools.

(15) In Texas teachers have no tenure, but are employed each year pursuant to a one-year contract. The Board nevertheless did not intend for any qualified teacher, Negro or White, to be discharged as a result of closing the high school department of the Booker T. Washington School. When Superintendent King proposed this closing to the Board, he reported that it would not cause a decrease in the number of faculty in the system, and would not require any qualified teacher to be discharged. He expressed the opinion based on prior experience, that normal attrition in the system would exceed any surplus created by the closing; and, that this would permit all qualified teachers who wished to continue teaching in the District to be absorbed, either in the lower grades at the Booker T. Washington School or in other formerly all-White schools. The Board was particularly concerned lest any teachers in the high school grades at Booker T. Washington School be discharged as a result of the closing, and requested the Superintendent to conduct a study to verify the above opinion expressed by him. He did so, and reported to the Board that all qualified teachers could be retained and none discharged as a result of the closing.

(16) The primary factor leading to Superintendent Brooks' resignation was Board dissatisfaction with his personnel policies, which the Board felt had led to the retention of teachers who were unfit to teach. In 1959 or 1960 he had initiated a procedure of written evaluations, but he did not use the evaluations in making personnel decisions; rather, the evaluations were intended only to help principals improve each teacher's performance. None of the many witnesses at the trial could remember a single instance in which Brooks had discharged a teacher for cause. The dissatisfaction on the part of the Board with respect to his personnel policies was not directed to the retention of unfit teachers of any particular race.

(17) Dr. Bittick's first effort when he succeeded Mr. Brooks was to acquaint himself with the quality of the individual teachers in the system. The Board had made it clear to him that it was not pleased with the way Mr. Brooks had handled personnel matters and that it considered the fitness of teacher personnel in the system one of its most serious problems. All teachers in the system possessed the minimum qualifications prescribed by the State to teach in Texas, but the Board desired to attract the best teachers in Texas to teach in Texas City. The Board established generous salaries for teachers and encouraged its Superintendents to evaluate all teachers in the system with an eye toward replacing the poor performers with new teachers who were more competent. Accordingly, Dr. Bittick asked the principals to visit each classroom and observe teachers teaching. He also asked the principals to keep records and make written notes so that they might prepare a written recommendation in essay style on each teacher for the personnel files. Other supervisory personnel would also give him recommendations which he would evaluate with the principals' recommendations to prepare himself to discuss personnel with the Board. Such other supervisory personnel included the Assistant Superintendent for Instruction, Mrs. Totsie Ross, formerly Director of Curriculum for the District; and with respect to Bonner in particular, the Director of Special Education, Robert Breckenridge. Mrs. Ross also had served the District as Coordinator of

Elementary Education for two years and as a teacher of Mathematics for two years.

(18) The evaluation form developed by Superintendent King was not narrative. It called for the principal to rate each teacher with respect to a number of designated characteristics, and required the principal to add a statement supporting any rating of superior or unsatisfactory. Superintendent Engman has prescribed a similar form containing a numerical rating scale designed to enable the evaluator to compile the numbers into a total grade.

(19) During the 1964–1965 school year, Booker T. Washington School offered all twelve grades and had 28 teachers, 1 librarian, 1 secretary-registrar, and 1 principal. Four of these teachers, plaintiff Winfred H. Bonner, Mrs. Claudine Hall, Freddie Niles, and Miss Audrey Rice, and the librarian, Mrs. Barbara Randall, were not offered contracts by the Board for the 1965–1966 school year. In the remainder of the Texas City system, 67 White teachers, including 10 who had expressed a desire to be rehired for the 1965–1966 school year, were not offered new contracts.

(20) Calvin Vincent, a Negro, has been Principal of the Booker T. Washington School for approximately 20 years, including all times material to this action. He and Mrs. Ross were the two persons who had most of the responsibility for evaluating teachers at Booker T. Washington School and making reports to the Superintendent. Vincent would prepare formal written reports (narrative for Dr. Bittick, specific and detailed for Mr. King or Dr. Engman), often after consultation with Mrs. Ross. If the written report was unfavorable, the Superintendent would confer with both Vincent and Mrs. Ross informally before deciding whether to recommend reemployment to the Board.

(21) The 1964–1965 school year was Mrs. Claudine Hall's first year in the Texas City system. She taught a second grade class at Booker T. Washington School. Vincent recommended against reemploying her because he rated her incompetent as a teacher and because she manifested such a hostile and disrespectful attitude toward him, personally, that she had become a liability to the smooth functioning of the school.

(22) Mr. Freddie Niles joined the Texas City system in 1958. He was a coach and physical education teacher, and had been given a probationary contract for the 1964–1965 school year, in accordance with Vincent's recommendation. During the spring of 1965, Niles requested a conference with Vincent and advised him that he planned to seek employment elsewhere. For this reason Vincent did not prepare a written evaluation of him for the Superintendent or recommend him for reemployment.

(23) Miss Audrey Rice also joined the Texas City system in 1958. She taught science courses in grades 7 through 11. The administration did not question her mastery of the subject matter of these courses, but both Vincent and Mrs. Ross felt that she was not stimulating her students. Mrs. Ross considered her unable to adapt her material down to the level of her students and found her impatient with slow learners. Both Vincent and Mrs. Ross found Miss Rice's disposition and attitude toward authority unsatisfactory. Vincent declined to recommend her for reemployment for the 1964–1965 school year, but she was given a probationary contract and rehired over his objection. During the 1964–1965 school year, Miss Rice informed Vincent that she did not want to teach in an integrated school and did not like Texas City, and that she therefore would find another job. For this reason Vincent did not prepare a written evaluation of her for the Superintendent or recommend her for reemployment.

(24) Mrs. Barbara Randall joined the Texas City system in 1962 as the Booker T. Washington School librarian. Both Vincent and Mrs. Ross considered

her incompetent. Vincent refused to recommend her for reemployment for the 1964–1965 school year, but she, too, was given a probationary contract and rehired over his objection. Vincent did not recommend her for reemployment for the 1965–1966 school year or prepare a written evaluation of her for the Superintendent because he understood from her that she did not choose to return the next year to teach.

(25) Because he considered her incompetent, Vincent would not have recommended Mrs. Randall for reemployment for the 1965–1966 school year had she expressed a desire to continue teaching in Texas City. Nevertheless, out of kindness and a desire not to injure her professional career more than necessary, Vincent told Mrs. Randall, who lived in La Marque, Texas, that she would have to live in Texas City if she was to work there. She declined to move.

(26) Defendants did not fail or refuse to reemploy Mrs. Hall, Mr. Niles, Miss Rice or Mrs. Randall for the 1965–1966 school year because of his or her race or color. The performance of the three veteran teachers (Mrs. Randall, Mr. Niles, and Miss Rice) had been of such borderline quality that their principal had recommended that they be hired conditionally for the 1964–1965 school year. Mrs. Hall taught only one year and turned out to be incompetent and uncooperative. The District failed to rehire them because it had found them unfit to teach in Texas City.

(27) Defendants did not fail or refuse to reemploy Mrs. Hall, Mr. Niles, Miss Rice, or Mrs. Randall as a consequence of the District's plan of desegregation or because of the closing of the Booker T. Washington High School. Mrs. Hall was hired after desegregation had begun and grades 10, 11, and 12 had been integrated. Moreover, she taught the second grade, which was wholly unaffected by the closing of the Booker T. Washington High School. The three veteran teachers received their adverse recommendations and con-

ditional contracts prior to the 1964–1965 school year. This was several months before either the Board or the administration first considered closing Booker T. Washington High School, and over a year before the Board decided to close it. There was no connection between the closing of the school and the failure to reemploy Mrs. Hall, Mr. Niles, Miss Rice, or Mrs. Randall.

(28) Neither Mrs. Hall, Mr. Niles, Miss Rice, nor Mrs. Randall, applied to the Board for reemployment. The Board was not informed of their dissatisfaction, if any, in failing to receive contracts for the 1965–1966 school year.

(29) Mr. Niles, Miss Rice, and Mrs. Randall appeared pursuant to subpoenas issued at plaintiff's request and were called by plaintiff as witnesses. Each testified that he, or she, did not wish to participate in this case in any way. Mrs. Hall also was called by plaintiff as a witness and testified that she was willing to participate in a suit for damages, but not in a suit for an injunction.

(30) Plaintiff was employed by the District in 1954 to teach speech therapy and work with the mentally retarded at the Booker T. Washington School. After the first year, and until the end of the 1960–1961 school year, he taught only speech therapy. Problems developed with plaintiff. Thereafter, until the end of the 1963–1964 school year, plaintiff was assigned certain teaching duties in the regular school program at Booker T. Washington School. This was in addition to his work in speech therapy. For the 1964–1965 school year, plaintiff was given a probationary contract. He taught no Special Education courses in 1964–1965. He was assigned four classes of social studies and language arts in the junior high school, and one class of United States history in the high school, all at Booker T. Washington. He was not rehired for the 1965–1966 school year.

(31) Special education is a field which embraces the teaching of the mentally retarded and pupils with

speech, hearing, or other defects. The District's Director of Special Education when plaintiff was employed by the District and until the end of the 1962–1963 school year was a Mrs. Erin. She was succeeded by Mr. Robert Breckenridge, who resigned after serving for the 1963–1964 school year, and then by Mrs. Betty Sheppard, who served during the 1964–1965 school year.

(32) Until the fall of 1959, plaintiff was assigned teaching space at the Booker T. Washington School, but was responsible only to the Director of Special Education. He was not under the jurisdiction or supervision of Principal Vincent, and owed no duty to the principal to perform extracurricular duties.

(33) Commencing in 1959 plaintiff was placed under the joint control and supervision of Principal Vincent and the Director of Special Education. When plaintiff began teaching in the regular school program in the 1961–1962 school year, Principal Vincent's supervision of his work increased and for the first time he also came under the jurisdiction of Mrs. Ross. His responsibility to the Director of Special Education continued, with respect to his teaching in Special Education. He was not pleased with these changes.

(34) During the 1964–1965 school year, under the terms of his probationary contract, plaintiff taught no Special Education courses. Instead, he was assigned four classes of social studies and language arts in the junior high school and one class of United States history in the high school, all at Booker T. Washington. He was not rehired for the 1965–1966 school year.

(35) The administrative officials whose evaluation of plaintiff is most pertinent here are Principal Vincent, Assistant Superintendent Ross, Director of Special Education Breckenridge, and Superintendent Bittick. In summary of the detailed findings which follow, the Court finds that each of these four persons finally concluded that no rea-

sonable hope existed for plaintiff ever to be other than a liability to the Texas City school system. The lengthy record in this case contains not even a suggestion that either in evaluating plaintiff's fitness as a teacher, or in determining or recommending whether he should be offered a teaching contract for the 1965–1966 school year, any of his superiors was influenced to any extent whatsoever by plaintiff's race or color. Nor is there a suggestion that the District's plan of desegregation or the decision to close the high school department of Booker T. Washington School had any connection whatsoever with the decisions of plaintiff's superiors that he was unfit to teach in Texas City. Plaintiff's relationship with each of these four superiors and their evaluation of him as a teacher will be discussed in turn.

(36) *Plaintiff and His Principal:*

(36–a) As soon as plaintiff began teaching courses other than speech therapy during the 1961–1962 school year, Principal Vincent began trying to help him with his teaching. He would visit plaintiff's class several times each year and then offer help at personal conferences with him and during regular faculty meetings. Plaintiff's response to his principal's efforts to help him was an air of disrespect and sullen hostility. This attitude remained constant until plaintiff left the school system.

(36–b) Principal Vincent demonstrated respect for plaintiff as a person and exhibited great patience with him, despite continuing provocations by plaintiff.

(36–c) On March 29, 1962, the principal sent plaintiff a memorandum which called to the latter's attention his failure to make lesson plans. The making of lesson plans was recommended in bulletins issued by the education agency of the State of Texas and was required, by the administration, of all teachers in the Texas City system. In the memorandum, Vincent informed plaintiff that teachers who failed to make lesson

plans would not be recommended for reemployment.

(36–d) On October 24, 1962, the principal sent plaintiff a memorandum regarding unauthorized visitors in plaintiff's classroom. Notwithstanding the memorandum, plaintiff on later occasions allowed unauthorized persons to visit his classroom.

(36–e) During the 1962–1963 school year, and the two years thereafter, the principal appointed plaintiff chairman of a two-man social studies committee. As chairman, plaintiff had the responsibility of preparing a report at the end of the year. He did not do so and offered no explanation at the time for his failure. He testified at trial that the report was made by another member of the committee. This was categorically denied by the Principal.

(36–f) On March 21, 1963, the principal sent plaintiff a memorandum criticizing the manner in which he handled his speech students. Plaintiff's practice was to send the special education children alone to his classroom for their speech classes, rather than picking them up at their regular classrooms and accompanying them to his classroom as required by school policy. The communication stated that it was the second reminder.

(36–g) Plaintiff responded the same day. In a typewritten reply, which he placed on the desk of the principal's secretary where the entire faculty could see it, plaintiff called the principal's memorandum a false accusation, denied the facts and concluded with a thinly veiled threat:

"May I make this a matter of written record, *I shall not tolerate no further false accusations*." (Emphasis added.)

The principal called plaintiff to his office and asked him what he meant. The confrontation got out of hand almost immediately, however, and the principal broke it off. He asked plaintiff to go with him to Superintendent Brooks' office. The meeting was held, and Brooks, who had never been known to dismiss a teacher in the system for cause, told plaintiff and the principal to return to the school and get along with each other.

(36–h) The principal called plaintiff to his office during the 1963–1964 school year to counsel him about his practice of basing his entire classroom presentation on the textbook alone. The principal wished to interest plaintiff in using a variety of materials to make his teaching more exciting and stimulating and therefore more effective. The conference was a failure, as a result of plaintiff's disposition to argue, debate and resist rather than to accept the suggestions of his principal.

(36–i) On October 1, 1963, the principal wrote plaintiff a letter expressing serious concern with the discipline of students in the latter's homeroom classes. This problem was most acute just before and after school. Plaintiff did not reply orally or in writing to this letter, and the principal received no cooperation from plaintiff as a result of the letter.

(36–j) Faculty morale was weakened by plaintiff's constant criticism of the principal's administrative policies. Plaintiff's activities not only interfered with the principal's function as the administrative leader of the school, but were also a major contributing factor in causing the principal to develop a peptic ulcer which required him to spend the 1963–1964 Christmas holidays in the hospital.

(36–k) Plaintiff was called the "lawyer" of the Booker T. Washington School. During the 1963–1964 school year, plaintiff spent substantial time during school hours gathering information for use by the attorney representing three teachers, not involved in this lawsuit, who were not rehired to teach at the Booker T. Washington School for the 1964–1965 school year. This time, which should have been directed to plaintiff's teaching responsibilities, distracted from his own teaching effort and created a general distraction at the school.

(36–*l*) During the 1963–1964 and 1964–1965 school years, the principal assigned "police" duties to plaintiff at the rear of the gymnasium during the arrival

and assembly of pupils between 8:00 and 8:30 a. m. in the morning. Plaintiff would appear at his station on time, but would appear oblivious to the disorder in the vicinty which it was his duty to prevent.

(36–m) On April 9, 1964, plaintiff made a speech during school hours without permission. The lady who wished him to make the speech during school hours requested permission from Principal Vincent, who refused. She then approached Mr. Breckenridge, who conferred with the principal and Superintendent Bittick. When the Superintendent learned that the principal had made a decision, he supported it, and declined to approve plaintiff's making the speech. Plaintiff nevertheless notified the principal that he would not be at school that day, and made the speech in violation of the Principal's and Superintendent's decision.

(36–n) In May 1964 the principal attended a conference which had been called by Superintendent Bittick. Also present were Mr. Breckenridge, Mrs. Ross, and plaintiff. At the conference, Principal Vincent reported that plaintiff and his teaching had not improved during the 1963–1964 school year. In particular, he reported that:

A. Plaintiff was hostile and defiant toward him personally.

B. Plaintiff was hostile toward the school administration.

C. Plaintiff's lesson plans were poor.

D. Plaintiff's performance of duties and assignments was poor.

E. Plaintiff was a trouble-maker among the faculty.

F. Plaintiff was unfit to teach.

G. He, Vincent, could no longer work with plaintiff.

(36–o) The principal first recommended verbally to Dr. Bittick that plaintiff not be rehired for the 1964–1965 school year, but later changed this to a recommendation that plaintiff be rehired conditionally.

(36–p) Although the principal had instructed all teachers to prepare inventories of their audio-visual aids before leaving school at the end of a term, plaintiff did not do so in May 1964. As a result, the principal was forced to prepare the inventory himself.

(36–q) About November in the fall of 1964, after plaintiff had been given a conditional or probationary teaching contract for the 1964–1965 school year, the principal had a talk with plaintiff concerning the latter's total reliance on the lecture method of teaching. The principal had observed that plaintiff was giving the children no opportunity to recite or discuss the material. He would read to them from newspapers for about 30 minutes during an average class. This left 15 to 25 minutes of inactivity in each class, during which plaintiff made no effort to teach the children. The children were observed in the classroom doing absolutely nothing on several occasions.

(36–r) After receiving the suggestion from the principal that the lecture method not be used exclusively and that other teaching aids be employed, plaintiff continued to ignore all of the various teaching aids, except one. He did commence showing movies to all of his classes, and did so for weeks at a time. The principal said nothing to plaintiff about this, as he thought it would disturb him. The principal felt that the children were getting some benefit from the movies even if they were being overdone. He did not want to chance upsetting plaintiff again, perhaps depriving the children of this small benefit.

(36–s) During the 1964–1965 school year, the principal visited plaintiff's classroom five or six times. On those occasions students were observed engaging in horseplay while plaintiff wrote postcards. When the principal asked what was going on, the students replied that they had had their class.

(36–t) Plaintiff was assigned the responsibility of organizing an assembly program for his homeroom to present to

the entire school on November 4, 1964. One purpose of such a program is to give each student the opportunity to appear on stage twice each year. On the day of the scheduled event plaintiff notified the principal that he would not perform, and the assembly was cancelled. In order not to prejudice the students in plaintiff's class, the principal assigned him a second date for putting on an assembly program. Again plaintiff failed to perform, thus depriving his students of this experience and violating the instructions and policies of his principal.

(36-u) The principal did not recommend that plaintiff be reemployed for the 1965-1966 school year. On the teacher evaluation form he prepared on plaintiff, the principal gave plaintiff low ratings in most categories. In support of these low ratings, the principal wrote:

[*Staff Relationships:*] Teacher does not promote friendly intra-school relationships. Advises some teachers against administration and seeks any discord from teachers.

[*Teaching Techniques:*] Teacher does not make detailed lesson plans and use textbook. When teacher was absent the pupils say teacher just talks to them and did not require them to study or report on any class work.

[*Classroom Environment:*] Classroom environment is very poor. Children are not stimulated.

[*Results Obtained:*] Students are not challenged. The pupils he teaches are academically slow, but the teacher could motivate them in some manner.

[*Preparation for Assignment:*] Teacher is not adequately prepared to teach in the present areas.

[*Attitude Toward Responsibility:*] This teacher was phased out of another assignment. I feel that his present position does not satisfy him.

[*Comments:*] This teacher was asked to resign last year (May, 1964) by the Superintendent of Schools, but he did not resign. Several teachers were not given contracts, and they told the Superintendent that this teacher advised them on their conduct.

[*Recommendation:*] I am recommending that this teacher not be reemployed for 1965-66 school year.

(36-v) Based upon my observation of Principal Vincent and plaintiff, both on the witness stand and in the courtroom generally throughout this somewhat lengthy trial, my consideration of their oral testimony and their various writings introduced in evidence, as well as the uncontroverted evidence concerning the manner in which they conducted themselves during the period covered by the testimony, I am of the opinion that Principal Vincent is a credible witness and that plaintiff is not. Therefore, when their testimony has been in conflict, I have accepted that of Principal Vincent and rejected that of plaintiff.

37. *Plaintiff and the Assistant Superintendent for Instruction, Mrs. Totsie Ross:*

(37-a) During 1957, when Mrs. Ross was the District's Elementary Co-ordinator, Superintendent Brooks requested her to observe plaintiff's classroom work and report to him on the number of students plaintiff had and what appeared to be his general attitude in the performance of his duties. The Superintendent made this request because he had heard rumors and received questions concerning plaintiff from parents and Board members. Principal Vincent accompanied Mrs. Ross to plaintiff's classroom. Mrs. Ross made an oral report to Superintendent Brooks, in which she expressed the opinion that plaintiff's teaching effort was not conducive to helping the children with their speech disorders. She reported that the children were doing nothing when she and the principal entered the room, and very little when they left. Finally, she reported that plaintiff had no record of the number of students who were in speech therapy, no diagnostic tests, no record of conferences with teachers or parents, and no schedule of his therapy classes.

(37–b) Mrs. Ross did not convey her criticism to plaintiff because he was not then under her supervision. However, she did ask the principal why the situation was allowed to exist, and learned that the latter had sought but been unable to obtain any improvement.

(37–c) Mrs. Ross next visited plaintiff's classroom shortly after he began teaching courses in the regular curriculum during the 1961–1962 school year. Thereafter, she visited his classroom and observed his teaching performance on several occasions. She found his classroom dull and drab and discovered that he was not adhering to the curriculum prescribed by the District.

(37–d) After plaintiff began teaching courses in the regular curriculum, Mrs. Ross conferred with him about his teaching on several occasions. She found, however, that due to his passive but antagonistic attitude, she was unable to communicate with him.

(37–e) On her visits to plaintiff's classroom, Mrs. Ross noted that his students responded listlessly to his teaching. He explained to her that he was not using the prescribed textbook because it was too difficult for the students. He consistently failed about 60 percent of his students, even though only a few of the students whom he failed were also failing in their other classes. This high failure rate concerned her greatly.

(37–f) After plaintiff came under her supervision in 1961, Mrs. Ross recommended to Superintendent Brooks that plaintiff not be reemployed. This recommendation was not followed.

(37–g) In connection with Superintendent Bittick's evaluation of all teachers in the system in response to the request of the Board in 1963, Mrs. Ross recommended to him that plaintiff not be reemployed for the 1964–1965 school year.

(37–h) Again in 1965, after Mr. King had succeeded Dr. Bittick as Superintendent, Mrs. Ross recommended that plaintiff not be reemployed.

(37–i) Based upon my observation of Mrs. Ross while she testified at the trial, I am of the opinion that her testimony was candid and objective and her recollection clear. I find her to be a credible witness and accept her testimony as the true version of the facts where in conflict with that of plaintiff.

(38) *Plaintiff and Director Breckenridge:*

(38–a) During the 1963–1964 school year, when Mr. Breckenridge was Director of Special Education for the District, plaintiff taught speech therapy as well as regular courses at the Booker T. Washington School, and was responsible for the one-half unit (at least 30 students) which the State had allocated to that school. Special education programs, including programs in speech therapy, are specially funded by the State. *See* Vernon's Ann.Tex.Rev.Civ.Stat. art. 2922–13 (1965).

(38–b) In January 1964, at the request of Mr. Breckenridge, Mr. Don Partridge, Director of the Division of Special Education of the Texas State Education Agency came from Austin, Texas, to review the speech therapy program at the District. Breckenridge asked for Partridge's advice because he desired to strengthen the speech therapy program in the District.

(38–c) Mr. Partridge discovered that many of the file folders for plaintiff's students did not contain articulation test sheets, and so informed Mr. Breckenridge.

(38–d) The State of Texas requires school districts administering speech therapy to conduct articulation tests and complete articulation test sheets as justification for placing any child in a speech therapy unit.

(38–e) About a week after Mr. Partridge's visit, Mr. Breckenridge had a conference with plaintiff and the other speech therapist in the system. He told them of Mr. Partridge's report and informed them that articulation test sheets must be filled out and placed in each

student's folder. The other therapist had filled out sheets for all of her students. Either at that time, or shortly thereafter, plaintiff told Mr. Breckenridge that he had not realized that the State required the sheets to be filled out.

(38–f) Mr. Breckenridge did not have occasion to return to Booker T. Washington School until May 1964. At that time he went back because he wished to increase the half unit there to a full unit. Since at least 60 qualified students are required to justify a full unit, it was necessary to qualify this many in the short time remaining before the end of school in June. It was plaintiff's responsibility to do this. This work fell upon the system's other speech therapist, however, because plaintiff was absent at that time allegedly suffering from hypertension.

(38–g) When he and the other therapist commenced the work necessary to expand the half unit, Mr. Breckenridge discovered that plaintiff had not prepared the articulation test sheets which he had been instructed to do in January. Their absence from the students' folders placed the half unit already at the Booker T. Washington School in jeopardy.

(38–h) Mr. Breckenridge then reported his dissatisfaction with plaintiff to Superintendent Bittick. As Mr. Breckenridge recalled this report at the trial, it was:

> That I thought that Mr. Bonner had specifically not followed the instruction, that I thought he was in conflict with the school administration, and I knew of no other reason why he would not follow the instruction. Either he had his mind on something else or he didn't like me and he did not follow the instructions. And if he endangered my program I didn't want him back in my unit the following year as a speech therapist.

(38–i) Mr. Breckenridge had no criticism of plaintiff's ability as a speech therapist. He considered plaintiff's failing to be his inability or refusal to follow instructions.

(38–j) Based upon my observation of Mr. Breckenridge when he testified at the trial of this case, I find Mr. Breckenridge to have been a credible witness. Mr. Breckenridge is no longer connected with the District and has no interest in the outcome of this case. At the time of trial he was Assistant Superintendent of the Denton State School for the Mentally Retarded, Denton, Texas. I accept his testimony as the true version of the facts, and reject that of plaintiff where the two versions are in conflict.

### (39) *Plaintiff and Superintendent Bittick:*

(39–a) From his discussions with the Board, Dr. Bittick knew that personnel matters would be one of his prime responsibilities at Texas City. He began this task by accompanying his principals on visits to almost every classroom in each school during the fall of 1963.

(39–b) Accompanied by Principal Vincent, Dr. Bittick visited one of plaintiff's classes during the fall of 1963. Dr. Bittick's opinion of plaintiff's teaching, based on this visit, while not firm, was unfavorable. Recalling this opinion at the trial, Dr. Bittick testified:

> [H]ere was a class of youngsters who obviously weren't attentive, who were uninterested, and Mr. Bonner sitting at his desk talking to them, lecturing to them, as we call it in the profession.
>
> I felt like he was not aware of their attitude towards his teaching and he was just missing them completely. As far as I was concerned, it was just a waste of time.

(39–c) Dr. Bittick had two conferences with plaintiff during the spring of 1964, one in March and the second in May. Dr. Bittick seldom called conferences with teachers. While Superintendent at Texas City, he called only two others. These other conferences involved both White and Negro teachers.

(39–d) The purpose of the March conference was to let plaintiff "know officially, very officially, his teaching was lacking and was deficient." Principal Vincent and Mrs. Ross had already rec-

ommended to Dr. Bittick that plaintiff not be reemployed for the following year. At the conference Dr. Bittick told plaintiff:

A. that his teaching was an urgent problem;

B. that he had no plans or outline;

C. that his use of instructional material needed to be improved;

D. that he needed to become aware that it was his job to motivate the children;

E. that his principal was his immediate superior and he must follow his instructions; that he must not try to "run his own little outfit over there, and to get all the support he could get and thumb his nose at the principal";

F. that he would be watched for the rest of the year for signs of improvement; and

G. that his contract for the next school year would be held back for a decision later in the spring.

(39-e) After his first conference with plaintiff, Dr. Bittick asked Principal Vincent, Mrs. Ross, and Mr. Breckenridge to keep a close eye on plaintiff and to keep him (Dr. Bittick) informed.

(39-f) At the second conference Principal Vincent, Mr. Breckenridge, and Mrs. Ross were also present. It was called to discuss the progress or lack of progress which had been made since March. Dr. Bittick told plaintiff that he had received no indication of improvement. He also reviewed plaintiff's deficiencies. In the language of his testimony at trial:

I discussed specifically with Mr. Bonner—whether the first or second conference—all the details of the problems, difficulties with his teaching methods and techniques, and reviewed all of what we consider the poor practice of his lessons, his difficulty to get through to the children, his refusal to accept his role as a mediator of youngsters. This was all discussed in detail.

(39-g) Dr. Bittick had been kept fully informed of the problems Mr. Breckenridge was having with plaintiff in the special education program.

(39-h) Dr. Bittick offered plaintiff a probationary contract for the 1964–1965 school year on the condition that he would be relieved of his special education assignment and given a regular teaching assignment. Dr. Bittick explained to plaintiff orally that he was being offered the contract with the condition because

He couldn't handle the freedom he seemed to enjoy. He did whatever he wanted to do and couldn't understand just what his responsibilities were.

He told plaintiff that he was being taken out of the special education program so that he would be under only one supervisor, Principal Vincent. However, when asked at trial about plaintiff's response to these instructions, Dr. Bittick replied:

I don't think Mr. Bonner has heard a word I have said yet.

(39-i) Dr. Bittick discussed plaintiff's weaknesses and the terms of his probationary contract with the Board, as well as with his successor, Superintendent King.

(39-j) Dr. Bittick, when Superintendent during the 1963–1964 school year, did not contemplate closing the high school department of the Booker T. Washington School.

(39-k) Based upon my observations of Dr. Bittick while he testified at trial, I find him to have been a well informed witness in all respects—certainly a credible one. He is no longer connected with the District and has no interest in the outcome of this case. At the time of trial he was serving as Deputy Associate Commissioner for Field Service for the United States Office of Education in Washington, D. C. I accept his testimony as the true version of the facts where in conflict with the testimony of plaintiff.

(40) *Plaintiff and the Board:*

(40-a) The Board has always relied heavily upon the recommendations of the Superintendent and his staff with refer-

ence to the hiring, rehiring, assignment, and refusal to rehire teachers in the system. At a Board meeting in the spring of 1965 Superintendent King presented the Board with a list of teachers whose contracts would be renewed. After approving that list, the Board went into executive session to discuss privately the twenty-three persons who were not being rehired. There Superintendent King explained each of his recommendations. Members of the Board asked particularly about teachers at Booker T. Washington School who were not being rehired, for the Board was concerned lest any be terminated as a result of the discontinuance of the high school grades there. Superintendent King explained his reasons for not recommending each of the five Negro teachers who were not rehired. With respect to plaintiff, he gave a detailed report. He advised the Board that plaintiff was not preparing adequate lesson plans, that his attitude was one of indifference, that he had a record of excessive absenteeism, that he was not performing his duties as a teacher, that he was not getting along with and was making trouble for his principal, that he was not following his principal's instructions, that he was insubordinate, and that he was a trouble-maker.

(40–b) When plaintiff learned that Superintendent King had recommended to the Board that he not be reemployed, he asked for a hearing before the Board and a reconsideration of the decision not to reemploy him. His request was granted, and a hearing held on April 9, 1965.

(40–c) At the hearing held at plaintiff's request, plaintiff appeared represented by counsel. After plaintiff and his attorney had presented his case, the Board retired in executive session. Also present were Superintendent King, Principal Vincent, the attorney for the District, and newly elected Board members who had not yet taken office. At this session, Superintendent King repeated the information he had given the Board earlier in the spring. Principal Vincent joined the Superintendent's recommenda-

tion that plaintiff not be rehired, and told the Board that he did not want plaintiff at his school any more. The Board recalled Dr. Bittick's detailed criticism of plaintiff given the year before. The Board knew that plaintiff had been given a probationary contract for the 1964–1965 school year. The Board members themselves believed plaintiff to be unfit. Therefore, after reconsidering the matter in executive session, the Board adhered to its earlier decision not to reemploy plaintiff.

(41) In his lengthy direct and cross examination, plaintiff testified to only one occurrence which remotely suggested that his dismissal was accompanied by racial overtones, or was directly or indirectly related to the closing of the high school department of Booker T. Washington School. Plaintiff testified that at one or more faculty meetings during 1963–1964 and 1964–1965, Principal Vincent stated that the Booker T. Washington School would lose students due to integration, "That they are going to take the students, but I am sure they won't take the teachers * * * if you can find a place, I would advise you to start looking for one." Assuming that these statements were made, an assumption which is open to serious question, the most which can be said for them is that they were conjecture on the part of the Principal as to facts and policy, not statements of fact by him.

(42) Principal Vincent testified that no one in authority with the school system ever told him that the number of Negro teachers would be cut down because of the closing of the Booker T. Washington High School. As heretofore found, the high school department was closed as a result of the reduction in students but the number of qualified Negro teachers was not reduced; and furthermore, the high school department was not ordered closed until a study had been made for the Board, which demonstrated to the Board that the number of such teachers would not be reduced.

(43) Defendants did not fail or refuse to reemploy plaintiff for the 1965–1966

school year because of his race or color. They failed to rehire him because they had found him unfit to teach in Texas City.

(44) Defendants did not fail or refuse to reemploy plaintiff for the 1965–1966 school year as a consequence of the District's plan of desegregation or because of the closing of the high school department of the Booker T. Washington School. There was no connection whatsoever between the closing of the school and the failure to reemploy plaintiff.

(45) In his original complaint, plaintiff prayed for injunctive relief and punitive damages, but not for compensatory damages. In the pretrial order he stipulated that he had suffered no decrease in salary. In his amended complaint, he prayed for back pay for himself and the members of his class, and for attorneys' fees. However, he did not seek to revoke the stipulation which had been approved by the Court in the pretrial order. Nor has he sought to revoke the stipulation since.

(46) Before commencement of the trial, each party furnished the Court a Trial Brief as requested. At the conclusion of oral argument, each party was requested to and did furnish the Court Proposed Findings of Fact and Conclusions of Law, together with memoranda of authorities and supplements thereto.

(47) To the extent that any of the statements labeled "Conclusions of Law" constitute statements of fact, they are hereby found as such.

### III. CONCLUSIONS OF LAW

(1) *Jurisdiction.*

(1–a) The Court has jurisdiction of the parties and the subject matter of this controversy. 28 U.S.C. § 1343(3); 42 U.S.C. § 1983; Harkless v. Sweeny Indep. School Dist., 300 F.Supp. 794 (S.D. Tex. June 6, 1969).

(1–b) Although the complaint in this cause names as defendant the District and the Superintendent and Board members, there is no indication whether the individual defendants are sued in their official or their individual capacity. The Court notes that a motion to dismiss the District and the individual defendants in their official capacity would have been well taken. Harkless v. Sweeny Indep. School Dist., *supra.*

(2) *The Class Action.*

(2–a) On January 26, 1967, plaintiff amended his complaint pursuant to leave of Court obtained at pre-trial on January 23, 1967, to add a claim on behalf of the class of Negro teachers not rehired by defendants for the 1965–1966 school year. On January 30, the first day of trial, defendants answered the amendment, alleging, inter alia, that "The amendment * * * fails to state a claim * * * on behalf of a class upon which relief can be granted." During the afternoon session that same day, the Court advised plaintiff's counsel that it had considered the briefs submitted by the parties on this point and was of the opinion that the case was not a proper class action. The Court stated to counsel, nevertheless, that plaintiff would be permitted to try his case as a class action, with the point finally to be resolved after the record was closed. When plaintiff rested, defendants moved to dismiss the class action allegations in the amended complaint. The Court granted this motion, although the record of its decision is garbled. The reasons which follow are the ones which caused the Court to conclude that defendants' motion should be granted.

(2–b) Rule 23(a) (1), F.R.Civ. P., specifies as a prerequisite to a class action that: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable". This prerequisite is not met here. The only Negro teachers not rehired by defendants for the 1965–1966 school year other than plaintiff were Mrs. Hall, Mr. Niles, Miss Rice, and Mrs. Randall. The total class thus could number no more than 5 per-

sons. Seventeen potential class members were held too few in DeMarco v. Edens, 390 F.2d 836 (2d Cir. 1968). Sixteen were held too few in Giordano v. RCA, 183 F.2d 558 (3d Cir. 1960). Ten were held too few in Association for Preservation of Freedom of Choice, Inc. v. Wadmond, 215 F.Supp. 648 (S.D.N.Y. 1963). Seven were held too few in Thaxton v. Vaughan, 321 F.2d 474 (4th Cir. 1963). *See also* Smith v. Board of Educ., 365 F.2d 770, 778 (8th Cir. 1966).

■ (2–c) Alternatively, assuming that the prerequisites specified in Rule 23(a) are met, plaintiff must show that this action falls within one of the subsections of Rule 23(b). He does not assert that it comes within subsection (b)(1). With respect to subsection (b)(2), plaintiff must show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole". Here this condition cannot be met, for three potential members of the class (Mr. Niles, Miss Rice, and Mrs. Randall) testified that they did not wish to participate in this action in any way, and the fourth potential member (Mrs. Hall) testified that she would only participate in a suit for damages. It would be inappropriate for the Court to consider granting final injunctive or declarative relief for *this* class as a whole.

■ (2–d) (i) For plaintiff to bring this action within the terms of subsection (b)(3), he must show "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Moreover, subsection (c)(2) of Rule 23 requires the Court to notify all members of the class of the pendency of the action and grants members of the class who wish to be excluded from the action the right to file such a request. In their testimony at trial, Mr. Niles, Miss Rice, and Mrs. Randall expressed a firm desire not to become associated with this action in any way. The Court finds that this testimony is sufficient to constitute a request to be excluded within the meaning of subsection (c)(2). This leaves a potential class of only two, plaintiff and Mrs. Hall.

(2–d) (ii) At the time the Court advised counsel on the first day of trial of its opinion that the case was not properly a class action, it stated that one of its purposes was to permit counsel to give immediate consideration to the possibility that the members of the alleged class might wish to file motions to intervene as plaintiffs. Counsel for plaintiff acknowledged this possibility by stating that it would be discussed at length, and did so in the context of getting the issue as to each of the other four teachers disposed of in the most expeditious manner. No motion to intervene was made on behalf of any of the four teachers, which is consistent with their testimony that they did not wish to participate.

■ (2–d) (iii) Secondly, the Court concludes that a class action is not maintainable under Rule 23(b)(3) because the questions of law or fact common to the members of this class do not predominate over the questions affecting only individual members. In the case of each member of the class, the ultimate issue would be whether the purported reasons for his or her discharge are constitutionally justifiable; if not, an inference of racial discrimination might arise. While this potential inference may be common to all five class members, it is not the predominant issue in the case, but rather an issue which can only be proved indirectly by the introduction of evidence pertaining to each individual.

■ (2–d) (iv) Finally, the Court concludes that a class action is not "superior to other available methods for the fair and efficient adjudication of the controversy." As between Mr. Niles, Miss Rice, or Mrs. Randall and the de-

fendants, there is no controversy. And it would be inefficient to try plaintiff's and Mrs. Hall's claims together, for he desires injunctive relief and she does not, he was a veteran teacher and she was not, he was evaluated by Mrs. Ross and she was not. Should Mrs. Hall have wished to bring a claim against the defendants, she could have intervened in this action or proceeded in a separate action.

### (3) *The Procedural Due Process Issue.*

(3–a) During oral argument, immediately after the evidence was closed, plaintiff moved to amend his complaint and the pre-trial order to add a claim that he had been denied due process of law by virtue of the procedures defendants had used to determine not to rehire him. This motion was denied in a memorandum and order dated July 11, 1967, in which certain facts were found and conclusions of law stated. It is incorporated herein by reference. The Court found that "To grant the motion would be to violate this court's pre-trial procedures and the integrity of the pre-trial order." The Court also found that because the issue sought to be added is subordinate to the ultimate issue for determination by the Court, plaintiff would "suffer no injustice from denial of the motion." The Court adheres to the reasoning and its conclusion announced July 11, 1967, but also concludes that to the extent that the motion seeks to allege a cause of action independent of the original cause of action based on race, it must be denied, and leave to amend refused, for four reasons.

■ (3–b) Divorced from plaintiff's claim of racial discrimination, the procedural due process allegation fails to state a claim upon which relief can be granted. As the Court of Appeals for the Eighth Circuit recently held, "persons discharged for inefficiency, incompetency, or insubordination have no constitutional right to a hearing with rights of cross-examination and confrontation

of witnesses." Freeman v. Gould Special School Dist., 405 F.2d 1153, 1161 (8th Cir. 1969). Due process of law requires only that plaintiff not be discharged for constitutionally impermissible reasons. Absent such reasons, the Board may discharge him in any way it sees fit. *Id.* at 1157–1161.

■ (3–c) Secondly, plaintiff's due process claim is insufficient because he has failed to exhaust the administrative remedies available to him. He cannot come into federal court claiming that administrative procedure is unfair unless he has exhausted that procedure without obtaining redress, or he can show that the remedies themselves are unfair, inadequate, unavailable, or ineffective. He cannot complain that the initial stage of the administrative process is unfair unless he is also prepared to show that administrative review is incapable of correcting the errors below. Randell v. Newark Housing Authority, 384 F.2d 151 (3d Cir. 1967), cert. denied, Avent v. Newark Housing Authority, 393 U.S. 870, 89 S.Ct. 158, 21 L.Ed.2d 139 (1968); Chaney v. State Bar of California, 386 F.2d 962 (9th Cir. 1967), cert. denied, 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162 (1968); Wheeler v. Montgomery, 296 F.Supp. 138 (N.D.Cal.1968) (*per curiam*) (three-judge court), probable jurisdiction noted, 394 U.S. 970, 89 S.Ct. 1452, 22 L.Ed.2d 751 (1969); Boone v. Wyman, 295 F.Supp. 1143 (S.D.N.Y. 1969). The State of Texas has provided a procedure for administrative review of cases like this one. Tex.Rev.Civ.Stat. Ann. art. 2654–7, § 1 (1965). Plaintiff has introduced no evidence showing an attempt to exhaust it, and has made no effort to show that the procedure for review is unfair, inadequate, unavailable, or ineffective to correct any errors which may have been made by the Texas City Board or administration. For this reason he may not attack the fairness of the Texas City Board's procedure here.

■ (3–d) More generally, this Court believes that proper respect for a federal system embracing states which have

duties and responsibilities of their own requires federal courts, at the very least, to insist that persons aggrieved by a State's operation of its system of public education exhaust the administrative remedies provided by the State for the correction of abuses. Language in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) and McNeese v. Board of Educ., 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), it is true, suggests that exhaustion of state remedies can never be required in suits brought pursuant to 42 U.S.C. § 1983. Neither *Monroe* nor *McNeese,* however, presented the precise issue which is now before this Court. *Monroe* did not involve the State's interest in running its system of public education, and in *McNeese,* the procedure for review was inadequate. It has been argued that these cases should not, as a matter of policy, be read as precluding courts from requiring the exhaustion of state remedies in appropriate cases. Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1486 (1969). The Court finds that the State's special interest in overseeing the operation of its system of public education makes this an appropriate case for requiring the exhaustion of the remedies made available by state law. In paragraph (3–c) it was noted that the State of Texas has provided a procedure for administrative review of cases like this one, and that plaintiff does not attack the adequacy, availability, fairness, or effectiveness of this procedure. Comity does not allow this Court to permit plaintiff to bypass appropriate administrative procedures. Whether comity also requires a federal court to insist on the exhaustion of state judicial procedures may be left to another case.

 (3–e) Finally, the Court concludes that the procedure afforded by the District to plaintiff comports with due process. The process adopted by the District for evaluating teachers was as objective as the Board or administration in good faith could make it. The Board members and administrative officials who testified at trial candidly admitted that the evaluative process was not perfect. But due process does not require perfection, nor does it require absolute objectivity. It has recently been held that not "every person directly affected by administrative action must be afforded all of the procedural rights guaranteed in a full-fledged judicial trial." Kelly v. Wyman, 294 F.Supp. 893, 902–903 (S.D.N.Y.1968) (three-judge court), probable jurisdiction noted sub nom. Goldberg v. Kelly, 394 U.S. 971, 89 S.Ct. 1469, 22 L.Ed.2d 751 (1969). And in the instant case the procedure established by the Board and the administration to ensure that no teacher would be unfairly dismissed was fully adequate. Each Superintendent's review of the recommendations of his supervisory personnel was dispassionate. The Superintendent on occasion overruled recommendations of his supervisory personnel, as here, and gave marginal teachers another chance. Moreover, even if this procedure within the administration was inadequate, review by the Board was ample. The Board granted a hearing to any teacher who requested one, and permitted the teacher to offer any evidence or argument he chose. At the hearing held at plaintiff's request on April 9, 1965, as reflected by the Minutes of the Board, plaintiff was represented by counsel. Plaintiff was permitted to offer evidence and his counsel gave a summation of his case after the evidence had been received by the Board. On this record, the Court finds and concludes that the District did not deny plaintiff due process by virtue of the procedures used to determine that he would not be rehired. *Accord,* Brown v. Greer, 296 F.Supp. 595 (S.D.Miss. 1969); Sessions v. Connecticut, 293 F. Supp. 834 (D.Conn.), aff'd per curiam on the opinion below, 404 F.2d 342 (2nd Cir. 1968).

#### (4) *The Claims Based on Race and Desegregation.*

 (4–a) In his original complaint plaintiff alleged that the District's fail-

ure to rehire him for the 1965–1966 school year was based upon his race or color and was a consequence of the closing of the high school department of the Booker T. Washington School. The Court finds beyond a reasonable doubt that neither of these was a factor in the District's failure to rehire him, and further concludes that the failure to rehire him did not infringe his right to due process of law or his right to equal protection of the laws.

(4–b) (i) No decision by the Court of Appeals for this Circuit has been found by the Court or cited to the Court by the parties which resolves a controversy like the one here. United States v. Board of Educ., 332 F.2d 40 (5th Cir. 1964), was brought on behalf of a teacher who allegedly had been discharged for voter registration activities. It involved the voting rights provision of the Civil Rights Act of 1871, 42 U.S.C. § 1971(b). The court of appeals affirmed a district court judgment holding that the Government had failed to sustain its burden of proof under the statute. In Henry v. Coahoma County Board of Educ., 353 F.2d 648 (5th Cir. 1965), cert. denied, 384 U.S. 962, 86 S.Ct. 1586, 16 L.Ed.2d 674 (1966), the court of appeals affirmed a judgment against the plaintiff teacher, adopting as its own the opinion of the district court, 246 F.Supp. 517 (N.D. Miss.1963). This case also turned on the plaintiff's failure to meet her burden of proof; in addition, there was a question of state law not present here.

(4–b) (ii) Since *Henry* the only word from the Fifth Circuit on faculty desegregation has come in desegregation suits, not in suits by discharged teachers for injunctive relief and damages. Of the desegregation suits, United States v. Jefferson County Board of Educ., 372 F.2d 836, 892–894 (5th Cir. 1966), clarified on rehearing en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied, Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967), is the most prominent. In *Jefferson* the court prescribed a decree for entry by the district courts in the cases then on appeal. With respect to faculty and staff, this decree first prescribes a process for desegregating faculty, and then treats the problem of dismissals:

(b) *Dismissals*. Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.

380 F.2d at 394. The first sentence of this passage, of course, merely states the ideal of nondiscrimination. The second and third sentences prescribe steps to be taken to ensure that decisions to displace or dismiss teachers, where such are required *as a result of desegregation,* be fairly made. The fourth sentence is inapplicable in a suit by a teacher for reinstatement and other relief.

(4–c) In plaintiff's first brief, attention was called to the pendency of a teacher dismissal case in the Court of Appeals for the Fifth Circuit. Steward v. Stanton Indep. School Dist., No. 23291. In a per curiam opinion, the court of appeals vacated the judgment and remanded the case for further con-

sideration, "in the light of the recently decided cases of this Court," meaning *Jefferson* and others. 375 F.2d 774 (5th Cir. 1967). This occurred after the instant trial was concluded. Thereafter, a judgment was entered by the United States District Court for the Western District of Texas, which action the clerk noted as "Agreed judgment entered." Findings of Fact and Conclusions of Law were not prepared or filed by the court, since the judgment was consented to by both counsel and no appeal was to be taken. Therefore, the judgment is binding only on the parties and is not precedential authority for this case, or any other. Seaboard Air Line R.R. v. George F. McCourt Trucking, Inc., 277 F.2d 593 (5th Cir. 1960).

(4–d) While the Fifth Circuit has had little occasion to consider claims of Negro teachers allegedly dismissed as a result of desegregation, such litigation has been frequent in other circuits, particularly the Fourth. E. g., North Carolina Teachers Ass'n v. Asheboro City Board of Educ., 393 F.2d 736 (4th Cir. 1968); Chambers v. Hendersonville City Board of Educ., 364 F.2d 189 (4th Cir. 1966); Walton v. Nashville, Ark. Special School Dist. No. 1, 401 F.2d 137 (8th Cir. 1968); Smith v. Board of Educ., 365 F.2d 770 (8th Cir. 1966). The standards developed in other circuits have been applied without discussion in this circuit, Williams v. Kimbrough, 295 F.Supp. 578 (W.D.La.1969), and indeed are quite similar to the provisions of the *Jefferson* decree. In these cases, the issues presented by a suit for reinstatement and damages are distilled into three fact questions:

(i) Whether there has been a long history of segregation by the defendant school officials, a practice of evading their responsibilities as declared by the federal courts to desegregate, and an ultimate, reluctant, halting step toward desegregation. Where this has been shown, courts have held that plaintiffs need only establish that a disproportionate number of Negro teachers were discharged when desegregation finally came; once this prima facie showing has been made, the burden of proof shifts to the defendants to show that the discharge or failure to rehire was for nondiscriminatory reasons.

(ii) Whether the failure to rehire the plaintiff teachers is attributable to, or is a result of, desegregation.

(iii) Whether the school officials discriminated by race in choosing which teachers not to rehire. As a test to use in resolving this fact issue, courts have asked whether the school officials compared the qualifications of the teachers not rehired against the qualifications of all teachers given new contracts. This also would be required by the *Jefferson* decree. Moreover, courts have held that school officials may not compare the qualifications of Negro teachers not rehired with the qualifications of new applicants, if they retain White teachers without making such a comparison. In this particular, the *Jefferson* decree, which would seem to forbid school officials from ever comparing the qualifications of teachers currently employed with those of new applicants, is inconsistent with the case law. Whether or not the *Jefferson* decree is superior will be considered when this subject is discussed in the context of the facts of the instant case. See paragraph (4–e) (iii) *infra*.

(4–e) Each of these three ultimate questions of fact will be considered in turn.

(4–e) (i) The Court finds that the speed of desegregation in the Texas City school system, while deliberate, was appropriate. Although jurisdiction was retained in the desegregation case (Evans v. Brooks, *supra*), no one has seen fit to move to reopen the case, or to move to intervene as a party. Moreover, almost immediately after the first *Brown* decision in 1954, the Board began the desegregation process by commissioning a study of the community. Thereafter, the Board took the initiative in developing a plan of desegregation, and then after obtaining court approval of

the plan, in accelerating the plan whenever feasible. Throughout this period the Board, in its concern to desegregate the Texas City system as soon as practicable, was acting in a manner inconsistent with the policy of the State. After pupil desegregation had begun, faculty desegregation was delayed by the resignation of Superintendent Bittick and the death of Superintendent King, but these events were not within the Board's control. The Court finds no basis in the record of this case for shifting the burden of persuasion to defendants. It should remain on plaintiff. See also Lockett v. Board of Educ., 391 F.2d 272 (5th Cir. 1968) (per curiam); Lockett v. Board of Educ., 342 F.2d 225 (5th Cir. 1965).

(4–e) (ii) The Court finds beyond a reasonable doubt that plaintiff was not dismissed as a result of the District's plan of desegregation, or as a consequence of the closing of the high school department of the Booker T. Washington School. In the first place, plaintiff was not a high school teacher. During his last year in Texas City he taught four classes in the seventh and eighth grades and one class in the high school. Secondly, had it not been for Superintendent Bittick's extreme concern for plaintiff's rights as a teacher, plaintiff would not have been rehired for the 1964–1965 school year. The adverse recommendations of plaintiff that induced Dr. Bittick to give plaintiff a probationary contract for the 1964–1965 school year were made long before either the Board or the administration first considered closing the high school department at the Booker T. Washington School. The administration and the Board determined early in 1964 that plaintiff was unfit to teach in Texas City and offered him a probationary contract. When he failed to improve during the succeeding school year, he was not rehired. Finally, the Board took great pains to ensure that no teacher would be dismissed as a result of desegregation and was particularly cognizant of the possibility that teachers at Booker T. Washington School might be discharged as a result of the closing of the high school department there. Dr. Bittick had informed the Board the year before that plaintiff was a marginal teacher. Therefore, when Superintendent King recommended in 1965 that plaintiff not be rehired, the Board satisfied itself that his dismissal was for unfitness, not because of desegregation.

(4–e) (iii) (*a*) The Court finds beyond a reasonable doubt that plaintiff was not dismissed because of his race or color. In a seven-day trial to the Court, there was not a scintilla of evidence that plaintiff was dismissed because of race or color. Not even plaintiff in his lengthy direct and cross examination could point to anything anyone did that would suggest racial discrimination against him. The defendants opened their files to him and his counsel, and counsel, who are experienced in trying cases of this type, were unable to adduce any evidence at all of racial discrimination.

(4–e) (iii) (*b*) The only material not disclosed by defendants to plaintiff and his counsel was the personnel files of the principals in the Texas City system. Access to this material was not specifically requested until the fourth day of trial. The only relevancy plaintiff could then suggest was the chance that Principal Vincent's file would disclose racial prejudice on his part against plaintiff. The Court is skeptical that even with access to the principal's personnel file, plaintiff could have proved racial prejudice on the part of Vincent, a Negro active in many Negro and integrated civic activities; certainly plaintiff offered no more than a hope in support of his motion. The Court has examined Principal Vincent's personnel file in camera and finds nothing even suggesting a personal vendetta by him against plaintiff, racial prejudice directed against plaintiff, or bad faith in preparing evaluations or making recommendations about plaintiff.

(4–e) (iii) (*c*) Were it not for the rules developed in the case law

and prescribed in the *Jefferson* decree discussed in paragraph (4–d) (iii) *supra,* plaintiff could not complain of the procedure employed by the District in making its decision not to rehire him. For the reasons stated in paragraph (3–c) *supra,* plaintiff is barred from attacking the fairness of a procedure which he did not exhaust. Moreover, for the reasons stated in paragraph (3–e) *supra,* the procedure afforded plaintiff by the administration and the Board comported with due process. Nevertheless, the record of this case contains no evidence that either the administration or the Board expressly weighed plaintiff's qualifications against those of every other teacher in the Texas City system—indeed, Superintendent Bittick, Principal Vincent, Mrs. Ross, and all Board members testified that they and Superintendent King considered plaintiff a special case, a very serious problem. Moreover, it is undisputed that defendants hired new teachers to teach in 1965–1966, and that plaintiff met the minimum state qualifications to teach in all grades. Therefore, the record demonstrates that defendants complied neither with the test developed in the Fourth Circuit cases nor with the procedure prescribed by the Fifth Circuit in *Jefferson.* This Court concludes that their failure to comply was immaterial. It has already been found that the failure to rehire plaintiff had nothing to do with desegregation. Thus the predicate for both tests is absent. Moreover, no court has yet required school districts to retain unfit school teachers in the name of equal protection. The *Jefferson* decree, in particular, if applied literally gives teachers in school districts being desegregated a tenure status not enjoyed by any other teachers in the State, for it prohibits the displacement of unfit teachers by new recruits. The Fourth Circuit test is preferable to *Jefferson* because it permits districts like this one, who have been comparing teachers already in the system with new applicants for years, to continue improving their faculty. Yet even the Fourth Circuit rule enforces equal protection at some sacrifice to the quality of faculty, for it becomes applicable where a district has dismissed a Negro teacher in favor of a better qualified applicant. This Court is firmly of the opinion that a school board should be entirely free to discharge any teacher without tenure, which it considers to be unfit to teach the pupils who may be assigned to him. So long as the school officials do not apply or follow constitutionally impermissible considerations, they should be free to improve their faculty whether or not desegregation is in progress. *Accord,* Freeman v. Gould Special School Dist., 405 F.2d 1153 (8th Cir. 1969); Smith v. Board of Educ., 365 F.2d 770, 782 (8th Cir. 1966). *See also* Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

(5) The Court concludes, for the reasons stated in paragraph (3–d) *supra,* that the entire complaint in this cause should be dismissed.

(6) The Court concludes that plaintiff's prayer for injunctive relief should be denied.

(7) Inasmuch as plaintiff has stipulated that no compensatory damages are due him, his claim for punitive damages and attorneys' fees must be predicated, if at all, on his claim for injunctive relief and his claim on behalf of his class. Since the Court has concluded that this is not a proper class action; and has further concluded that plaintiff is entitled to no injunctive relief, it follows as a matter of law that plaintiff's claim for punitive damages and attorneys' fees should be dismissed. The Court concludes, therefore, that defendants' motion to dismiss should be granted in its entirety.

(8) To the extent that any statement elsewhere in this instrument constitutes a conclusion of law, it is incorporated herein by reference.