Bernice **ARMSTEAD** et al., Plaintiffs-Appellees,

v.

**STARKVILLE MUNICIPAL SEPARATE SCHOOL DISTRICT** et al., Defendants-Appellants.

No. 71-2124.

United States Court of Appeals, Fifth Circuit.

June 9, 1972.

Thomas J. Tubb, Tubb & Stevens, West Point, Miss., A. F. Summer, Atty. Gen. of Miss., Jackson, Miss., William Q. McKee, Edward F. McDowell, McKee & McDowell, Starkville, Miss., for defendants-appellants.

Stephen J. Pollak, Richard M. Sharp, Washington, D. C., T. H. Freeland, III, Oxford, Miss., David Rubin, Deputy Gen. Counsel Nat. Education Assn., Shea & Gardner, Washington, D. C., of counsel, for plaintiffs-appellees.

Before RIVES, COLEMAN and DYER, Circuit Judges.

DYER, Circuit Judge:

Starkville Municipal Separate School District appeals from the district court's judgment, 325 F.Supp. 560, based upon findings that a test given to teachers to qualify for employment was not substantially related to the knowledge and skills required of primary and secondary school teachers and its use by Starkville was both unreasonable and discriminatory. We affirm in part and reverse in part.[1]

In April, 1968, Starkville adopted School Board Policy 13–69. The policy, as amended in April and August of 1969, provided, *inter alia,* that in order to be considered for a teaching position a candidate must submit:

  d. An official transcript of the candidate's scores on the Graduate Record Examination with a minimum score of 750 on the verbal and quantitative sections or a percentile score of 60 or above on the advanced section in education or the special subject field in which the candidate is endorsed to teach.

  e. As an alternative to "d" above, a score of 500 on the commons section of the National Teacher Examination and a score of 500 on the teaching fields section of the NTE will give provisional status to the candidate until the Graduate Record Examination score requirements are met.

  f. As an alternative to "d" above, a teacher who holds a Master's Degree in any field or who holds an AA Teaching Certificate will not be required to present GRE or NTE scores.

  g. As an alternative to "d" above, a teacher who is enrolled in a graduate school program of education which is designed to lead to the Master's Degree in Education, which might be completed within a two year period after employment, will not be required to present GRE scores, provided that one-half of the required hours are earned during the first year of employment. Teachers who were employed during the first year these regulations were in effect will be allowed to qualify by acquiring the Master's Degree prior to September, 1970.

  h. A teacher who has not taken the Graduate Record Examination at the time of interview for a position may be employed, subject to qualification on the GRE and who agrees to take the GRE on the first available testing date. Teachers who receive GRE scores, after employment, who do not qualify will have the assurance of serving only one year even though the GRE scores do not meet the minimum requirements.

In addition to the above testing requirements for new teachers, incumbent teachers were also compelled to meet

---

1. We disagree with that part of the district court's findings and conclusions proscribing a Master's degree requirement described *infra* and thus reverse in part.

similar criteria for retention. These were as follows:

1. Teachers who are currently employed in the Starkville Public Schools must attain a minimum combined score of 640 on the verbal and quantitative sections of the Graduate Record Examination.

2. As an alternative to "1" above, the teacher may qualify by ranking in the 50th percentile, or higher, on the GRE in education or in the special subject matter field in which the teacher is endorsed.

3. As an alternative to "1" above, a teacher may qualify by holding a Master's Degree in any field or by holding an AA Teaching Certificate.

4. A teacher who does not hold a Master's Degree or an AA Teaching Certificate, or who fails to score 640 on the GRE or who does not rank in the 50th percentile, or higher, in the special subject matter field will be allowed two calendar years in which to meet one of the requirements.

During the 1969–1970 academic year student enrollment in the Starkville public schools was 4,313 with a racial ratio of 53 percent white and 47 percent black. Prior to a court desegregation order in February, 1970, the Starkville public schools operated a dual system based upon race.[2]

At the close of the 1969–1970 school year there were 191 teachers in the system, 134 white and 57 black. Of that number there were 4 white and 3 black principals. The faculty was reduced by 43 positions for the 1970–71 school year.

Of 17 white teachers not reemployed 9 had failed the Policy 13–69 requirements. 16 of 26 black teachers not reemployed had failed the new policy requirements. Starkville hired 32 new white teachers for the 1970–71 school year. No new blacks were hired on the stated grounds that there were no qualified black teachers available. Six blacks who applied for the new jobs met the new policy requirements but were not hired.

Prior to the implementation of Policy 13–69 applicants were required to submit a form containing personal and professional information and five references. In the event the superintendent or a principal decided to pursue an application he requested an evaluation of the applicant from the five references listed.[3] The applicant was then interviewed and evaluated on the same criteria used by the references. If the principal recommended the applicant to the superintendent, he in turn would make his recommendation to the Board of Trustees. A principal's recommendation would usually determine whether a teacher would be reemployed.

With the advent of Policy 13–69, an applicant was not considered unless the new testing or alternative criteria were met. This was a *sine qua non* for consideration of employment, irrespective of an applicant's ability with regard to the other criteria utilized in the hiring process.

Before Policy 13–69 was established, it had been ascertained by Starkville that a Graduate Record Examination score of 900 was required for regular admission and a 700 score was required for provisional admission to graduate school at Mississippi State University.

---

2. Montgomery v. Starkville Municipal School District, N.D.Miss.1970, Civ. No. EC 6937 (A)–S.

3. The five references submitted by the applicant were asked to evaluate the candidate in the following respects:

Appearance, voice, personality, cooperativeness, knowledge of his subject, use of English, teaching techniques, skill in discipline, pupil relationships, parent relationships, professional attitude, social and civic attitude, general vitality and emotional stability, general moral integrity, and spiritual depth.

Each party in the court below introduced expert evidence concerning the functions and objectives of the Graduate Record Examination. The GRE is composed of an aptitude test and advanced tests. The aptitude test contains a verbal section which tests vocabulary and reading comprehension and a quantitative section testing mathematical reasoning and graph interpretation. The advanced tests measure knowledge in specialized areas. The entire examination tests an individual's capacity for advanced studies at the master's and doctoral level. The tests were designed to assist graduate schools in the selection of students for graduate study, primarily for the doctorate. They were not designed for the purpose of identifying those who are or will be competent teachers at the primary and secondary level.

Neither the Educational Testing Service (ETS)[4] nor Starkville have ever conducted studies that would demonstrate the GRE's reliability and validity[5] for selecting public school teachers. The experts knew of no study or attempt by others which would suggest that GRE scores would be an effective measure of the competency of public school teachers. The Starkville superintendent admittedly knew that the GRE had nothing to do with determining teacher competency. Furthermore, no studies or other evidence was available to determine what cut-off, if any, would be a valid and reliable measure for this purpose.

The district court found that a prima facie case of racial discrimination had been proved. Because the GRE was not shown to be a reliable and valid measure for testing teacher effectiveness, the court enjoined its use for this purpose. It also proscribed the use of the alternatives because, as a practical matter, they did not differ substantially from the GRE requirement.

The use of the GRE test has operated to exclude more blacks than whites from teaching positions in Starkville. Starkville asserts that the reductions occurred because it desired to improve the faculty and the appellees were not among those who met the minimum standards established. A school board's desire to employ the best teachers available is both legitimate and commendable. However, in attempting to attain this laudatory objective, Starkville must not deny to any person the equal protection of the laws. U.S.Const. Amend. XIV; *see* Cooper v. Aaron, 1958, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5.

The district court found that the GRE score requirement classifies applicants and in-service teachers on the basis of race which required the school board to justify the classification with an overriding purpose independent of the discrimination. We need not go this far to uphold the judgment below. It is unnecessary to decide whether there was a sufficient showing that the policy did in fact create a racial classification. Cf. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. Nor do we need to decide what justification would be necessary to overcome any racial classification that might be found because the GRE score requirement does not measure up to the equal protection requirements under the Fourteenth Amendment, i. e., it is not reasonably related to the purpose for which it was designed.[6] *See* Eisenstadt v. Baird, 1972, 405 U.S. 438, 92 S.Ct. 1029, 1035, 31 L.Ed.2d 349 (1972); Turner v. Fouche, 1970, 396 U.S. 346, 362, 90 S.Ct. 532, 24 L.Ed.2d 567.

---

4. The Educational Testing Service designs, produces and administers the GRE.

5. An examination's reliability is the degree to which it consistently measures that which it purports to measure. Validity expresses the degree to which a test actually measures whatever it is used to measure.

6. Reed v. Reed, 1971, 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225; Lindsley v. Natural Carbonic Gas Co., 1911, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369.

Starkville has created an absolute classification among the teachers seeking reemployment and among those applying for initial employment. Those who attain a minimum score on the GRE are classified as suitable for employment while those who fail to meet this mark are automatically rejected. Although Starkville may have discretion to establish an appropriate classification, the classification must not be an arbitrary one, i. e., acting without any reasonable basis.[7] *See* Reed v. Reed, 1971, 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225; Lindsley v. Natural Carbonic Gas Co., 1911, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369.

We agree with the lower court's finding that the GRE score requirement was not a reliable or valid measure for choosing good teachers. It was undisputed that the GRE was not designed to and could not measure the competency of a teacher or even indicate future teacher effectiveness. However, it was established that the cut-off score would eliminate some good teachers. Consequently we find that it has no reasonable function in the teacher selection process.

■ The policy was adopted at a time when Starkville was being pressed both publicly and privately to desegregate its schools and establish a unitary system. The policy was not actually employed to dismiss incumbent teachers until Starkville had been ordered by the court to establish a unitary system in February, 1970. The teacher dismissals, alleged by Starkville to have been part of its new faculty improvement program, came in the wake of this desegregation order. Forty three teachers had left or were dismissed at the end of the 1969–70 school year. Of this number 16 were black teachers who were terminated pursuant to Policy 13–69. Thirty-two new white teachers were hired for the 1970–71 year. Clearly under Singleton v. Jackson Municipal Separate School District, 5 Cir. 1969, 419 F.2d 1211, en banc, cert. denied 402 U.S. 943, 91 S.Ct. 1611, 29 L.Ed.2d 112, the teachers dismissed must be, but were not, selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district.

■ Although we affirm the district court's findings on the GRE requirement, the evidence does not support that part of the order proscribing the use of an AA Teaching Certificate or a Master's Degree. We, of course, have no information on how a requirement for an AA Teaching Certificate or a Master's Degree would racially affect the future or incumbent teachers. Even if the effect of such a requirement resulted in a racially unbalanced faculty, the School Board would have to be given the opportunity to justify the use of such requirements. It is self evident that an individual must possess more than a minimum GRE score to be awarded a Master's Degree.

■■ Starkville also complains that the district court's order requires it to employ black teachers, without regard to qualifications, in order that the black-white faculty ratio for the 1971–72 academic year be made equivalent to the ratio of the 1969–1970 academic year. It contends that this amounts to the utilization of racial criteria in the hiring process in violation of Carter v. West Feliciana Parish School District, *supra.*

The district court's order does not require Starkville to hire black teachers without regard to their qualifications. Although the order required Starkville to hire black teachers for the 1970–71 school year if the number of black teachers fell below 30 percent, it also provided that Starkville could apply to the court for a waiver of this requirement if it was unable to comply. The court also ordered Starkville to hire as many black teachers as necessary to maintain a 30 percent black 70 percent white teacher ratio for the 1971–72 year. This por-

---

7. Arbitrariness has been equated with the absence of a rational basis. Bicknell v. United States, 5 Cir. 1970, 422 F.2d 1055, 1057.

tion of the order does not require a permanent racial faculty ratio. *See* Carter v. West Feliciana Parish School Board, *supra* at 878. The ratio utilized by the court existed during the 1969–70 school year before the dismissals took place. Obviously the court was attempting to restore the status quo. This was a proper order under the circumstances. *See* Smith v. Concordia Parish School District, 5 Cir. 1971, 445 F.2d 285.

The judgment of the district court is reversed as to the proscription of the use of an AA Teacher's Certificate or a Master's degree requirement. In all other respects the judgment is affirmed.

Affirmed in part, and reversed in part.

RIVES, Circuit Judge, concurring in part, dissenting in part:

While I concur with the majority insofar as they affirm the judgment below,[1] I am compelled to dissent from the partial reversal.

I find no justification for reversing the district court's holding that the Starkville School District cannot require of its teachers a Master's Degree or an AA Teaching Certificate. ("An AA Teaching Certificate indicates that the teacher has satisfied, *inter alia*, the requirements for a Master's Degree." (325 F.Supp. at 564, 565.)) Since Mississippi State University is the only university in Starkville, it is, as the district

court found, "the natural resort for teachers" who seek to obtain a Master's Degree or to take the courses necessary to satisfy the requirements for an AA Certificate. Moreover, since in order to gain "regular admission" to MSU an applicant must have a GRE score of 900, or to gain "provisional admission" a score of 700, the effect of imposing a Degree or Certificate requirement is to require by indirection a GRE cut-off score which is essentially equivalent to that required in Policy 13–69.

The inconsistency of striking only that part of Policy 13–69 which imposes a GRE cut-off is exemplified by the following hypothetical situation. Suppose a teacher currently employed in the Starkville system who possesses neither an AA Certificate nor a Master's Degree took the GRE and scored a 650. If Policy 13–69 were left undisturbed, that teacher would be entitled to retention. But in light of the majority's view he would be fired (since he has neither a Master's Degree nor a Teaching Certificate). Furthermore, having obtained only a 650 on the GRE, he could not gain admission to MSU in order to satisfy the alternative requirements of Policy 13–69 left intact by the majority. That result simply will not do.

I find persuasive the following part of the district court's opinion:

"The provisions of Policy 13–69 allowing in-service teachers to qualify

[1]. In a special concurrence, I think it not inappropriate to make reference to the Supreme Court's recent pronouncement in Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 23 L.Ed.2d 158, with respect to the rationale in support of the district court's injunction against the implementation of a GRE cut-off score. *Griggs* involved a challenge to employment practices brought pursuant to Title VII of the Civil Rights Act. Nonetheless its teachings are relevant to this Fourteenth Amendment challenge. In *Griggs*, Chief Justice Burger spoke for a unanimous court:

"[Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business

necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

" \* \* \* [G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability.

" \* \* \* [A]ny given requirement must have a manifest relationship to the employment in question."
401 U.S. at 431, 432, 91 S.Ct. at 853, 854. Similarly, I would conclude that the GRE has no "manifest relationship" with one's ability to teach at the primary and secondary school levels.

for reemployment by obtaining a Master's Degree or an AA Teaching Certificate, as a practical matter, do not constitute a meaningful alternative to achieving the required minimum score on the GRE because similar or higher GRE scores were required for admission to graduate school at Mississippi State University.

"As a practical matter, the provisions of Policy 13–69 allowing applicants for teaching positions to qualify by obtaining a Master's Degree [or] an AA Teaching Certificate do not offer college seniors and recent college graduates a meaningful alternative to obtaining the required minimum score on the GRE; nor in terms of expense and time are these provisions a meaningful alternative to those for qualification by making the required score on the GRE."

(325 F.Supp. at 565.)

Having so reasoned, the district court had no need to take evidence on the issue whether a Master's Degree or an AA Teaching Certificate is a reliable and valid tool for measuring one's abilities to serve as a primary or secondary school teacher. However, if it were demonstrated that one could obtain a Master's Degree or an AA Teaching Certificate without indirectly having to satisfy or exceed the GRE cut-off score declared invalid by the court below, this case would be different. In those circumstances the initial burden would be on plaintiffs to show that requiring a degree or a certificate serves to disqualify a disproportionate number of blacks. If that burden were carried, then defendants would have to show that the requirements at issue are properly related to job performance. Again, I emphasize that in the context of this case proof on the relevance of a Master's Degree or an AA Certificate was inappropriate since it was shown that either requirement indirectly serves to implement an invalid GRE cut-off.

Of course Starkville has every right to upgrade its faculty, even if in doing so

black teachers are disproportionately excluded. Such a proper motive must however be effectuated by valid, constitutional means—means which are here absent.

Accordingly, I concur in part and dissent in part.