Mary Helen GAY and Betty Jo Joyce, for themselves and for all teachers employed in the Anahuac Independent School District and for all other teachers, professionals and other persons similarly situated, Plaintiffs,

v.

Henry WHEELER, Individually, and in his official capacity as Superintendent of the Anahuac Independent School District, Chambers County, Texas, and the members of the Board of Trustees of the Anahuac Independent School District, individually to-wit, et al., Defendants.

Civ. A. No. 70–G–41.

United States District Court, S. D. Texas, Galveston Division.

Aug. 8, 1973.

Larry Watts, of Walker, Strahan, Brunson & Watts, Houston, Tex., for plaintiffs.

Joe H. Reynolds, of Reynolds, White, Allen & Cook, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

NOEL, District Judge.

This is a secondary school teacher contract non-renewal case. It arises out of a school district's failure to re-employ plaintiff as an elementary teacher following the expiration of the spring semester, 1967–68. It is brought in equity seeking as relief preliminary and permanent mandatory injunctions and monetary damages. Jurisdiction is asserted under the Civil Rights Act, 28 U.S.C. § 1343(3) and its substantive counterpart 42 U.S.C. § 1983. Before this case could be brought to trial, one of the named plaintiffs, Betty Jo Joyce, died, leaving Mary Helen Gay as the sole remaining plaintiff. Defendants are the Superintendent and members of the Board of Trustees of the Anahuac Independent School District, sued in their individual as well as official capacities. The latter two defendants will be referred to as the "Board" and the "District" respectively.

A question arises with respect to the Court's jurisdiction of individual school board members sued in their official capacity. The recent United States Supreme Court case of City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) has left the answer unsettled. The previous law of this Circuit had incorporated school district trustees in their representative capacity within the term "person" for the purposes of suit under §§ 1983 and 1343. Harkless v. Sweeny Independent School District, 427 F.2d 419 (5th Cir. 1970), rev'g 300 F.Supp. 794 (S.D.Tex.1969). In *Harkless* the Court of Appeals arrived at its result by drawing a distinction between a suit for monetary damages and a suit in equity seeking injunctive relief. Although Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) prohibited the exercise of federal judicial power in a § 1983 action seeking monetary relief brought against city police officers acting in their official capacity, the Court of Appeals in *Harkless* concluded, nevertheless, that school district trustees and administrators were susceptible to suits in equity for actions taken by them in their representative capacity. Harkless v. Sweeny, supra. However, *City of Kenosha*, relying explicitly upon *Monroe*, places a municipality outside the ambit of § 1983 for the purposes of *equitable relief*, as well as damages. It would seem that like a municipal corporation, a school district and its elected board members should likewise be excluded from § 1983 equity actions, such as the instant case. However, it is unnecessary for the Court to reach and resolve the issue since each District Board member here was sued in his individual capacity.

Initially, plaintiff alleged that this suit was brought as a class action on behalf of all teachers, professionals and other persons similarly situated. However, upon express agreement of the parties, the class action claim was dismissed. Plaintiff now alleges she was not rehired solely because of race. She seeks to restrain all defendants from refusing to hire and assign teachers without regard to race and specifically, from failing to offer her a teaching contract for the 1968–69 school year, solely because she is a Negro. Additionally, plaintiff asserts that her non-renewal was constitutionally defective and impermissible for lack of compliance with the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. After hearing the testimony of witnesses, considering the exhibits offered into evidence and briefs submitted, and the arguments of counsel, the Court now makes and enters its findings of fact and its conclusions of law. Rule 52, Fed.R.Civ.P.

### Findings of Fact

1. Before this case was brought on for trial one of the two named plaintiffs died. No request to substitute a successor or personal representative as party plaintiff was made. No evidence was offered on her behalf. The lawyer representing both the deceased and the surviving plaintiff, elected to proceed only as to the rights of the survivor, Mary

Helen Gay. Therefore, the deceased, Betty Jo Joyce's cause of action, if any, is dismissed. Rule 25(a)(2), Fed.R. Civ.P.

2. The District is a separate governmental entity created under and by virtue of the laws of the State of Texas. It embraces 362 square miles and provides education for approximately 1100 students. When this suit was filed, the District was financed from revenues raised from local taxation. No federal funds were sought or received.

3. Prior to September, 1964, the District operated a racially segregated, dual, school system with ethnic assignments. All Negro students and all Negro faculty were assigned to George Washington Carver School. White students with an all-White faculty were assigned to separate buildings.

Plaintiff, a woman of Negro heritage, was first employed in 1963 as a substitute teacher. In August 1965, she was hired as a full time first grade teacher at the George Washington Carver School (hereinafter referred to as Carver).

4. From 1965 to 1968 the District was engaged in the process of integration. By 1965, it had implemented and had operative a true freedom of choice plan. Under the plan, with parental approval, each student was allowed to select the school which he or she desired to attend. For the school year beginning September, 1965, 110 Negro children elected to transfer to a White school. During the same period, no White pupil chose to transfer into the all Negro Carver. This large incidence of unilateral movement was significant. One implication was that a substantial number of Negroes felt the formerly segregated schools offered the superior academic opportunity. Conversely, it implied that the Negroes felt the academic opportunities at Carver were inferior.

5. As a direct result of the significant response to the freedom of choice plan, the District administration concluded that total integration was imminent. The initial step toward total integration, sometimes referred to as unitization, was taken in 1966 when all Carver high school students were transferred to the all White Anahuac Senior High School. This left Carver with a small student body composed of junior high and elementary students. Accordingly, fewer teachers were required and a reduction in faculty was necessary.

6. The District had never been threatened with specific official compulsion to integrate, either from the United States Department of Health, Education and Welfare, the United States Department of Justice, or any court action. Discrimination in the operation of its schools had not been officially charged. To the contrary and at all times, the District had acted promptly, prudently, and voluntarily to comply with the changing laws and court pronouncements pertaining to desegregation. In short, there is no suggestion of any dilatory tactic, foot dragging, or intransigent resistance to compliance by the District with the emerging concept of a unitary school system, that is, to unitization.

7. Having determined that total integration and a consequential reduction in faculty were imminent, the administrators also determined that some measuring stick should be adopted to rate teacher teaching ability and effectiveness. In 1965, one of the most widely used and highly respected tools for such measurement was the National Teacher's Examination. It was and is now a national instrument used in ascertaining the competency and proficiency of a classroom teacher. Using objective standards, and a complement of tests, it is designed to assess a person's cognitive knowledge and understanding of the academic preparation for teaching. Upon recommendation of the Superintendent, the Board of Trustees of the District unanimously voted to require all teachers to take the Examination. It was to be taken at the college of their choice at the District's expense. Teacher applicants were required to take or to have taken the Examination before being considered for employment. Pursuant to

this stated policy, plaintiff took the National Teachers Examination in 1965 and received a composite score of 963.

8. At the February 1966 board meeting, a minimum score of 1000 was established for teachers taking the National Teachers Examination. This standard was not selected upon state or federal guidelines, for there were none. It was adopted after consultation with area educators and a study of the minimum scores established for other school districts, including the Houston Independent School District. This reasonable minimum requirement approximated a score of 500 in each of the two categories to be tested, (1) Common Examination (which included both professional and general education tests) and (2) Teaching Area Examination.

9. In 1967 the State Board of Education of Texas adopted the National Teachers Examination as a mandatory requirement for certification of teachers by the State Board. Only recently has the Examination fallen from favor as an evaluation tool and been disavowed as a tool for evaluation of teachers for retention purposes, by its authors as well as the State Board. At present, the most common and long enduring method of evaluating a teacher is by personal observation.

10. In April 1968, the Board determined that for the school year commencing September 1968, the District would completely unitize its school system. The Carver school was to be abandoned as all Negro. The District would operate three schools for all races, Anahuac Senior High School for grades nine through twelve, Carver for grades six through eight, and the Anahuac Elementary School for kindergarten through grade five.

11. Mr. Henry Wheeler is Superintendent of Schools and has served in that capacity since 1965. He is the chief administrative officer selected by the Board and charged with executing and enforcing the policies of the elected Board. All teaching and instructional personnel were then and are now hired and dismissed by the Board. The Superintendent recommends which non-teaching professionals and classroom teachers are to be re-employed. Normally, but not always, his recommendations are approved by the Board as a matter of course. Since State law does not provide for faculty tenure, every teacher in the District is hired on a year-to-year contract basis.

12. The Superintendent usually presents his recommendations for re-employment of classroom instructors to the Board at its regular March meeting. At that time, he recommends which annual teaching contracts should be renewed and which should be allowed to expire. A vote on his recommendations usually follows immediately after the full presentation as to all teachers. Pursuant to this procedure, in March, 1968 Superintendent Wheeler recommended that all teachers in the White schools be retained with the exception of three, thus leaving three vacancies to be filled at a later time. The Board voted to release the three White teachers not recommended and to rehire the remainder.

Superintendent Wheeler then recommended that any discussion concerning the predominantly Negro Carver faculty be deferred until the final transfer figures from the freedom of choice plan were tabulated. He explained that if the transfers were as substantial as in the past, the closing of Carver would become a real probability. By withholding the selection of faculty, Carver teachers were assured the first opportunity to fill the three vacancies created by the three White teachers whose contracts were not renewed, as well as any new positions created by changes in operations or new course offerings.

13. The results of the freedom of choice survey showed that Carver should be phased out as a Negro school. The Board determined that beginning in the fall term of 1968, the District would be totally integrated or unitized. As early as 1967, Superintendent Wheeler had realized that to implement a unitary educational system, staff requirements

would need adjustment. For this eventuality, he anticipated that the District would need four fewer elementary teachers and one less teacher on the secondary level.

14. Once the decision to convert to a unitary system was final, Superintendent Wheeler's problem was how to constructively pare the faculty and retain only the highest qualified teachers. The Superintendent approached his problem by formulating a system of teacher evaluation as an important factor in his recommendation for retention or release of a classroom teacher. While the process of conversion from the dual to a unitary system was taking place, all teachers in the District were notified that they would be evaluated and compared. From this notification each teacher was or should have been aware (a) that he or she was not automatically assured of a future faculty position, and (b) that the teaching positions might well be fewer in number.

15. A separate evaluation was made of each teacher's performance by his or her respective principal, the curriculum director and the Superintendent himself. One method of faculty evaluation employed in the District's system involved the completion by each building principal of an evaluation form. The form contained a list of characteristics deemed to be desirable in a teacher, including the following: appearance, performance, student relationship, teaching area, ability to teach, interest in school, knowledge of subject matter, and discipline. Under each characteristic, a blank was provided for the evaluator to score the particular teacher as "excellent", "very good", "average", "fair", or "poor", with numerical equivalents of one to five. Such a form is not an unusual evaluation tool; indeed, it is probably the most common type in current use. It had been used in the District for several years. As early as 1967, Principal Lewis of Carver school had used the form for evaluating his teachers. The earlier relative evaluations of the Carver elementary teachers in 1967, arrived at by a summation of the numerical equivalents were as follows:

GEORGE WASHINGTON CARVER FACULTY EVALUATION
SHEET (ELEMENTARY SCHOOL)

| | Appearance | Performance | Student Relationship | Teaching Area | Ability to Teach | Interest in School | Knowledge Subj. Matter | Discipline | Total |
|---|---|---|---|---|---|---|---|---|---|
| Clayton, E. | 4 | 3 | 5 | 3 | 3 | 4 | 3 | 5 | 30 |
| Doyle, H. | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 5 | 35 |
| Gay, Mary | 4 | 3 | 5 | 3 | 3 | 4 | 3 | 5 | 30 |
| Glenn, M. | 4 | 4 | 5 | 4 | 4 | 4 | 4 | 4 | 33 |
| Joyce, B. | 4 | 3 | 5 | 3 | 3 | 4 | 4 | 5 | 31 |
| Lewis, E. | 4 | 4 | 5 | 4 | 4 | 4 | 4 | 5 | 34 |
| Lewis, M. | 4 | 4 | 5 | 4 | 4 | 4 | 4 | 5 | 34 |
| Morgan, L. | 4 | 4 | 5 | 4 | 4 | 3 | 4 | 5 | 33 |
| Wilcox, D. | 4 | 4 | 5 | 4 | 4 | 4 | 4 | 4 | 33 |

Excerpt from Plaintiff Exhibit 3.

It is significant that plaintiff and the two elementary teachers with the lowest cumulative totals as evaluated, were the teachers who were not re-employed two years later.

16. At its regular meeting on March 8, 1966 and upon the recommendation of Superintendent Wheeler, the Board voted to rehire all elementary teachers at Carver for the 1966–67 school year. However, the recommendation and vote were made contingent upon the continued operation of the Carver school. Also, the Board adopted a resolution stating that the principal's evaluations would be given primary consideration in determining the qualifications of teachers when and if full integration should occur. The Board's policy was thus established for using the evaluations as tangible evidence in comparing the relative qualifications of personnel.

17. An evaluation prepared in February, 1968, was especially critical because the conversion to a unitary system was imminent. The outcome of the freedom of choice questionnaires would be determinative of whether the unitary system would be established and a consequent reduction in faculty would thereby be necessitated. Carver principal Herman E. Williams, a Negro, compiled and reported the 1967–68 evaluation as directed. The form used by him was similar to the one previously used by Principal Lewis. The numerical equivalent scores for the Carver teachers based upon the seven characteristics rated, together with the principal's recommendations for rehiring were as follows:

## FACULTY EVALUATION REPORT

### G. W. CARVER SCHOOL
February, 1968
Principal: H. E. Williams, Sr.

| | Appearance | Performance Prof. Duties | Student Rapport | Ability to Teach | Interest in School | Knowledge Subj. Matter | Discipline | Rehire |
|---|---|---|---|---|---|---|---|---|
| Appling, S. | 4 | 3 | 4 | 4 | 4 | 4 | 4 | Yes |
| Callahan, V. | 3 | 5 | 4 | 4 | 5 | 4 | 4 | Yes |
| Carrizalos, A. | 4 | 4 | 4 | 4 | 4 | 4 | 4 | ? |
| Lewis, M. | 5 | 4 | 4 | 4 | 4 | 5 | 5 | Yes |
| Clayton, E. | 3 | 2 | 4 | 3 | 2 | 2 | 3 | No |
| Doyle, H. | 4 | 4 | 5 | 4 | 4 | 4 | 5 | Yes |
| Gay, M. H. | 3 | 4 | 5 | 3 | 2 | 3 | 3 | No |
| Gibson, L. | 4 | 4 | 5 | 5 | 5 | 4 | 5 | Yes |
| Jones, C. | 3 | 2 | 3 | 3 | 4 | 3 | 3 | No |
| Joyce, B. | 4 | 3 | 2 | 3 | 3 | 4 | 1 | No |
| Lewis, E. | 3 | 4 | 3 | 4 | 4 | 4 | 4 | No |
| Miller, B. | 4 | 4 | 5 | 4 | 4 | 4 | 5 | Yes |
| Morgan, L. | 4 | 4 | 5 | 5 | 4 | 5 | 5 | Yes |
| Wilcox, D. | 4 | 4 | 4 | 4 | 4 | 5 | 4 | Yes |
| Williams, E. | 4 | 4 | 5 | 4 | 4 | 4 | 3 | ? |

Excerpt from Plaintiff Exhibit 1.

---

Plaintiff was rated fourth lowest among all the teachers at Carver. Along with the three lower rankings and the one directly above, plaintiff was not recommended to be rehired by Principal Williams.

18. Principal Williams made his evaluation without the assistance of any

written criteria or standards, other than as indicated on the evaluation form. In reaching an assessment of each teacher's proficiency and effectiveness, and scoring them on the characteristics and numerical scale indicated, he relied upon his teaching, administrative and supervisory experience. His professional judgment directed to each teacher was based upon his personal observation and day-to-day association with the teachers.

19. Curriculum Director William Fisher also made an independent evaluation of teacher performance, which was expressed numerically. The Curriculum Director had been employed by the District to appraise the quality of education being offered the students and to suggest improvements in teaching methods, as well as teachers. The basis for his numerical evaluation was personal classroom observations. To accomplish this purpose he would make two or three personal visits to each classroom per year. Using a grading scale similar to that used by the building principals, he would score each teacher under three main headings, (1) teacher, (2) students, and (3) room. The overall average was then computed to form a basis of comparison. Additionally, Director Fisher would record extensive notes and comments depicting detailed deficiencies and attributes as well as areas of strength and weakness. These direct observations and audits gave him familiarity with each teacher's progress and ability on a day-to-day basis. Combining both a numerical rating device with an anecdotal evaluation, Director Fisher assigned the following scores to plaintiff:

### CLASS VISITATION SUMMARY

TEACHER: Mrs. Mary Gay DATE: 4-4-68

| | | | |
|---|---|---|---|
| TEACHER | 1. | Appearance | 3 |
| | 2. | Enthusiasm | 1 |
| | 3. | Preparedness | 1 |
| | 4. | Presentation | 1 |
| | 5. | Relation with students | 2 |
| STUDENTS | 1. | Interest | 1 |
| | 2. | Participation | 1 |
| | 3. | Discipline | 1 |
| | 4. | Preparedness | 1 |
| ROOM | 1. | Conducive to learning | 2 |
| | 2. | Warm and Friendly Atmosphere | 2 |
| | 3. | Well arranged | 3 |
| | 4. | Visual displays | 3 |
| | | Total | 22 |
| | | Overall average . . . . . . . . . . | 1.69 |

Excerpt from Plaintiff Exhibit 5.

———————◆———————

Plaintiff's overall average for this evaluation was 1.69, considerably less than a "fair" rating of 2. Also, the anecdotes made by Director Fisher under the heading "comments" were far from complimentary. Specifically, he noted plaintiff's general unpreparedness, her failure to maintain the attention or participation of the students, and her overall lack of confidence in her teaching.

Although Director Fisher had no specific training or courses in the method-

ology or techniques of evaluating school personnel, he was well qualified by experience to observe the classroom and record his observations. A finding that a curriculum director who is without elaborate training in personnel administration is therefore incapable of observing and evaluating teacher performance would be fatuous. In addition to his considerable experience gained before this assignment, Director Fisher had the benefit of four years practical experience in the curriculum field with the District. In those years he had formulated definite ideas, techniques and philosophies on how a teacher should perform in order to carry out the policies of the District.

20. The decision of the Superintendent to recommend retention or separation was based on a variety of criteria. To complement the building principals' and curriculum director's evaluations, Superintendent Wheeler also periodically visited classrooms for the purpose of directly observing and evaluating each teacher's performance. Together with the three professional evaluations, the Superintendent considered the individual teacher's score on the National Teachers Examination, time in service, and the teacher's overall service to the District. Immediately prior to his final decision, he conferred at length with his co-evaluators. He apprised them of his anticipated recommendations and sought their suggestions, comments, and final approval. There was not the slightest inference in his testimony or the record as a whole, that the race or color of any teacher in any way affected his recommendations.

21. Plaintiff levied a broad-based attack upon the means used by Superintendent Wheeler to formulate his recommendations and in particular upon the validity of the evaluation methods employed by the Superintendent, the Curriculum Director and the building principals. Plaintiff's objections are predicated on the opinion evidence of Associate Professor Jody L. Stevens of the graduate faculty, Department of Admin-

istration and Supervision, University of Houston. Prior to his appearance at trial, Dr. Stevens had been afforded the opportunity to familiarize himself with the various evaluative devices used at Anahuac and to form an opinion as to their efficacy. His opinion was unfavorable.

At trial, Dr. Stevens was presented with a hypothetical question. He was asked if, in his opinion from the facts assumed, which were essentially the undisputed facts surrounding the teacher evaluations, a school board could legally decide to dismiss a teacher by non-renewal. Dr. Stevens' blanket answer was in the negative; that the evidence was insufficient to warrant dismissal. The only reason given for his opinion was that a dismissal under the facts assumed in the hypothetical question would be predicated upon deficient criteria, the various teacher evaluations accomplished by the school administrators.

Dr. Stevens began by stating that the overall purpose of evaluation of classroom teaching personnel is to see how well an individual teacher is meeting the stated goals of the district and community. Fundamental to such an evaluation, Dr. Stevens postulated the absolute necessity for creating what he termed a "sophisticated evaluative instrument." Prime requisites of such an instrument as characterized by Dr. Stevens were "objectivity" and "specificity." Though pressed, Dr. Stevens did not offer a rational explanation or definition of the terms "objectivity" and "specificity."

Based upon expert testimony heard in similar cases and its own research, and with deference due to the necessity for using extremely difficult-to-define words in explanation, the Court appreciates "objectivity" in this context to mean that the outcome of the evaluation should be determined to the greatest possible degree by the neutral characteristics of the evaluatee and to the smallest possible degree by the emotional feelings, personal predilictions or subjective preferences of the evaluator. The Court understands "specificity" in this context

to mean that the particular evaluative instrument or technique employed, have precise and systematic application with definitive standards to be uniformly applied. Dr. Stevens was unable to offer concrete standards by which to measure "specificity." A fair summation of his testimony is that objectivity and specificity are attained when similarly qualified evaluators apply similar criteria to similar situations and reach similar results. However, Dr. Stevens candidly admitted that only infrequently are two evaluator's results the same. In addition, he conceded that complete objectivity in personnel evaluation can never be entirely attained because one cannot eliminate the human judgment factor, the key word for which is "subjectivity." Although an "objective sophisticated evaluative instrument" may be highly desirable, such an instrument by definition would be difficult to formulate, much less use.

While there is a wide array of evaluative approaches from which a particular school district may select, Dr. Stevens insisted that the best or superior evaluative tool must contain the following elements: (1) uniformity, (2) specific guidelines for different levels of performance, (3) systematic application, and (4) advance notice of criteria given to evaluatees. Plaintiff's expert then opined that the District's evaluative mechanism was deficient or devoid of these elements vital to the best or superior tool. If the issue were only whether the District's method included all the vital elements postulated by Dr. Stevens, the Court would find that all four elements were not present in each method employed by each of the District's evaluators.

The Court rejects as unsupported in reason and contrary to the preponderance of the evidence in the record, the opinion of Dr. Stevens that the teacher evaluation technique employed at Anahuac from 1966–68 was necessarily unfair, biased or totally subjective because it did not embrace each of the elements postulated in his theoretical approach.

To the contrary, the checklist and numerical ratings used by defendants were then, and are now, widely accepted, commonly used and generally deemed reliable evaluative tools, instruments or methods by educators. The reason for the Court's rejection of Dr. Stevens' opinion and conclusion will be given later in some detail.

Dr. Stevens strenuously challenged the District's checklist method of teacher evaluation. He was especially critical of the use of general categories, such as appearance, performance of professional duties, student rapport, etc., and of the terminology of the scale by which to rate such categories, such as excellent, very good, fair, etc. Claiming this technique lacked specificity, Dr. Stevens proffered what he considered to be a "far superior" evaluative instrument, a "new concept" for evaluation, known as the "Instrument for the Observation of Teaching Activities," hereinafter referred to as IOTA, which he testified had been compiled and distributed by a council of professional educators. Dr. Stevens took a leading role in constructing the instrument. This new concept consists of a main subject to be examined, with a corresponding scale, scrambled in order and divided into what Dr. Stevens referred to as "levels of behavior." For example, for the central topic "room control," the quality of behavior levels are expressed in letter scale as follows: the letter A corresponds to "little or no variety"; the letter B covers "provides opportunity for a number of variety levels of activity related to the student"; the letter C represents "provides limited variety." Dr. Stevens stated categorically that well trained evaluators using the IOTA program "could" instantly recognize the teacher's level of performance and rate it accordingly. He attempted to distinguish his "sophisticated instrument" from the District's checklist and numerical rating system which he contended was "nothing more than a summary of the evaluator's opinions."

The Court is unimpressed with what it considers to be a fine line distinction,

if any, between the District and the IOTA methods. The words are different but the results are the same, a summary of the evaluator's opinions. The nomenclature of both systems is equally susceptible to subjective influences. The IOTA instrument uses the phrase "permits little or no variety." Both "little" and "variety" are subjective terms, subject to gradations and diametrically opposed interpretations. In the final analysis, the observer determines what is "little" and shows "variety" and then formulates a judgment whether or not a teacher's performance falls within that category. This differs insignificantly from the District's rating system, which is based upon traits and aspects of teaching and provides a reasonable and comprehensive rating of teachers and teaching services. Since Dr. Stevens shared in the creation of the IOTA instrument, the Court certainly respects his preference of it over the methods employed by the District. However, it must be borne in mind that the inquiry here is not what evaluative instrument or technique a qualified educator might prefer, or even which is superior. The issue here is whether the methods employed by the District were free from racial bias.

22. Dr. Stevens also severely criticized the District's failure to have specific written policies dealing with evaluations. Although the exact requisites of evaluations are not outlined in detail, their use as a factor in considering the retention of instructional personnel is explicitly set forth in the Board's published policies and regulations. (Policies and Regulations of the Board of Trustees, Chapter VI (II) O.). Further, all teachers knew or at least should have known the educational aims and philosophies of the District and, in turn, the levels of performance necessary to fulfill its goals. These are the very levels of performance which the building principals, Curriculum Director and Superintendent critiqued and evaluated prior to the preparation of their written evaluation reports.

23. Dr. Stevens vigorously assailed the District's use of the National Teachers Examination as a factor in determining teacher contract renewals. Although use of the examination for determining teacher employment and contract renewal has recently declined, it was in favor in the spring of 1968 as a means of teacher comparison and achievement. It provided a common measure of academic achievement based on national criteria, thus freeing it from local or personal prejudices.

Testing is always a relative concept and must be evaluated in the setting in which it is used. The Board and Superintendent used the National Teacher Examination as only one of several criteria to reach a final conclusion on which teachers to re-employ. Such use was appropriate and whatever reliance was placed upon the results was justified. The only valid objection to the use of the results of the examination by the District, would be, if the tests were administered or applied in a racially discriminatory manner. There is no evidence in the record that the tests were culturally biased, discriminatorily conceived, or that they had a discriminatory effect, racially or otherwise.

24. Dr. Stevens also skeptically noted the absence of any personnel in the District specially trained to conduct teacher evaluations. In lieu of such training, Dr. Stevens argued that "written definitive standards" to be followed in preparing personnel evaluations *must* be utilized by evaluating administrators. Without established directives, he concluded the evaluations became nothing more than subjective summary sheets of the evaluator's opinions. In addition, Dr. Stevens discounted whatever prior experience an evaluator may have had. However, the Court rejects as unsupported by the record, the proposition that constitutionally valid evaluations of teachers cannot be made by experienced educators and administrators who are familiar with the aims, objectives and goals of the District *unless they* employ "written definitive standards."

The ability of an experienced educator and administrator to evaluate by direct observation depends upon the individual's background, education and philosophy concerning quality of teaching. Certainly the District's evaluators were well versed in the District policies and capable of recording the observable qualities of a teacher's classroom preparation and presentation. The human equation of personal observation is understanding the scales and then making a judgment using the scales based upon one's observation. That involves a degree of subjectivity, but this is true irrespective of the particular instrument or technique utilized. The IOTA instrument requires this same kind of human judgment or subjectivity. To impose ironclad constraints upon the discretion of school administrators would seriously abridge and hinder them in the exercise of their duties. This Court declines to support any such restraint.

25. In answer to an inquiry from the Court, Dr. Stevens unequivocally stated that the area of school personnel administration is a non-controversial subject. He opined that the majority of expertise has presently centered on a single, specific and definite approach to evaluation. Again, the Court is forced to reject the Doctor's testimony. The Court has studied the extensive literature in the field and finds that it evidences a wide disparity of views and approaches to teacher evaluation. There is a great divergence of professional opinion as to who should do a teacher evaluation, how it should be done, and for what purposes it should be used.

The opinion expressed by plaintiff's witness Dr. Stevens is understandable in light of his admitted unfamiliarity with many of the nationally recognized authorities, and authoritative writings in the field. To the majority of questions concerning these works, Dr. Stevens evidenced no specific knowledge or opinion. By prior independent research in the University of Houston, Rice University and Houston Public Libraries, the Court has familiarized itself with the literature prepared by distinguished and recognized scholars in school administration and in particular, the history, techniques, teacher acceptance and use of teacher evaluation techniques for hiring, re-hiring, compensating and performance evaluation of teachers. The Court will judicially notice these writings, not for the purpose of determining whether a particular writer is right or wrong in his approach but for the purpose of showing the wide variation of opinion on the subject of the controversial nature of the entire subject. Suffice it to say that most authorities agree the field of teacher effectiveness and how to rate it is far from any general consensus.

The divergence of viewpoints evidenced by the literature was dramatized by Dr. Stevens' skeptical attitude toward the efficacy of classroom observations as an evaluative method. He categorically denied that direct observation was a proper method of evaluation. However, upon further inquiry, he readily admitted that observation of an instructor in a classroom setting is the most prevalent method of teacher evaluation and generally recognized to be superior to any other evaluative tool.

26. It is not within the province or the competence of this Court to attempt to resolve the ongoing controversy over the advisability of teacher rating or evaluation and the relative effectiveness of the various techniques used for that purpose. The real issue now before the Court is not whether the District practiced sound personnel management *but whether it practiced racial discrimination* in selecting the teachers not to be re-employed. At most, plaintiff has shown that the District failed to adopt plaintiff's view of what constitutes superior evaluative techniques. However, there was no credible testimony offered that the methods used by the District were arbitrary, capricious, or racially motivated. Plaintiff has failed entirely to show that "race" played any part either in the evaluations, or in any other aspect of the District's failing to re-employ plaintiff. On the contrary, the District's evaluation techniques were fair, reasonable, and non-discriminatory, both

in concept and in their application to plaintiff.

27. Statistically, the District has never evidenced, nor presently evidences, a pattern of racial discrimination in its employment practices. Insofar as the record here reflects, its hiring and firing policies were then and are now grounded on objective, non-racial criteria. From 1965 to date, 19 white teachers have been released from the system for incompetence, inefficiency or poor professional attitudes and ethical standards. During the same period, only five Negro teachers have been discharged, all at the end of the 1967–68 school year in the wake of unitization. Plaintiff because of her low level of performance and ineffectiveness was one of the five not offered a re-employment contract. Since 1967, five new Negro personnel have been added in the District.

28. In determining which teachers would be recommended for re-employment during the 1968–69 school year, the qualifications of each incumbent teacher were measured against those of all teachers, irrespective of race, in the same grade/subject matter area. Plaintiff, therefore, was matched with the other first grade teachers. However, plaintiff's teaching proficiency and skills were compared primarily with three White first grade teachers. In reality, these were the teachers with whom she was actually competing for reemployment. The record is unclear whether plaintiff's qualifications were ever weighed against those of her first grade counterpart at Carver, Mrs. M. Lewis. In any event, no evidence was adduced at trial with respect to such a comparison, if any, between plaintiff and Mrs. Lewis, who was retained for the 1968–69 term. The Court finds no repugnancy or inconsistency in this silence because the fulcrum of plaintiff's case was the presence of racial discrimination in failing to offer her a teaching contract for the 1968–69 academic year. Thus, for the purpose of this suit, such a comparison would lack significance.

A schematic reconstruction of the comparisons actually completed produces the following results:

(a) Curriculum Director Fisher's Class Visitation Summary (divided into the three areas rated)

| | Teacher | Students | Rooms | Average |
|---|---|---|---|---|
| Plaintiff M. H. Gay | 8 | 4 | 10 | 1.69 |
| Other first grade teachers: | | | | |
| J. Leggett | 23 | 18 | 20 | 4.69 |
| F. Hill | 24 | 20 | 20 | 4.92 |
| S. Gibbs | 24 | 18 | 20 | 4.76 |

Finding: Mary Helen Gay was the least qualified of the members of the relevant interracial group.

(b) National Teacher Examination scores

| | General Area | Subject Matter | Total |
|---|---|---|---|
| Plaintiff M. H. Gay | 530 | 433 | 963 |
| Other first grade teachers: | | | |
| J. Leggett (not included in record) | | | |
| F. Hill | 560 | 456 | 1016 |
| S. Gibbs | 690 | 543 | 1233 |

Finding: Mary Helen Gay scored lowest on the National Teachers Examination among the members of the relevant interracial group.

(c) Teacher Experience in the District (longevity)

| | Total years |
|---|---|
| Plaintiff M. H. Gay | 3 |
| Other first grade teachers: | |
| J. Leggett | 4 |
| F. Hill | 25 |
| S. Gibbs | 10 |

Finding: Mary Helen Gay has the least experience of the members of the relevant interracial group.

———◆———

29. After the Board voted to terminate the contracts of six Carver teachers, it became incumbent upon the supervising principals to notify them of their dismissals. Whether or not Principal Williams complied with the established procedure for such notification is unclear from the record. In any event, Superintendent Wheeler took it upon himself to apprise them of this fact. Within a day or two of the April Board meeting, he requested the teachers not to be re-employed to come by his office after school. At this session, Mr. Wheeler explained the decision to convert to a desegregated system and its attendant reduction in faculty and notified them of their non-renewals. Also, he indicated that several of the dismissals were prompted by poor evaluations and would have occurred irrespective of unitization. Plaintiff fell into this latter category.

Additionally, Superintendent Wheeler told the teachers he would personally discuss each individual's situation upon request and advised them of their right to appeal the Board decision. Only one terminated teacher availed herself of this opportunity. However, the procedures for hearing and appeals are explicitly enumerated in the policies and regulations and contained in the teacher handbook theretofore provided plaintiff.

Cumulative of the notification given by the Superintendent, all teachers knew or should have known that they were being evaluated for a potential staff adjustment, as early as 1965. They were advised that the National Teacher Examination would be used as one criterion in evaluating which teachers would be retained if it became necessary to phase out Carver. As unitization approached, all teachers were told that they would be evaluated and compared. All teachers were well aware that their jobs were in jeopardy. In fact, after renewing all contracts for the 1966–67 year, the Board publicly cautioned Carver faculty members that their election was contingent upon the continued operation of Carver. At two separate meetings in the early fall of 1967, Superintendent Wheeler explained that all faculty were being evaluated for a possible reduction of teaching personnel when Carver was phased out. It follows that plaintiff was fully informed of the actions to be taken and once such actions occurred, plaintiff cannot then be heard to complain of a defect in notice.

*Conclusions of Law*

I. *Procedural Due Process*

In her original complaint, plaintiff alleged that the means by which the Board failed to renew her contract did not comport with the requirements of due process. The allegations in this regard comprised a compendium of procedures which she claims are constitutionally mandated before defendant District may terminate her employment. Yet, it is now axiomatic that due process does not in every instance require a governmental entity to conduct a trial-type hearing before discharging an

employee. Cafeteria & Restaurant Workers' Union Local 473, AFL–CIO v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Likewise, due process need not be afforded in all situations where a teacher is dismissed. Lucas v. Chapman, 430 F.2d 945, 947 (5th Cir. 1970). The law in this area has recently become distilled and refined by the case of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *Roth* teaches that the requirements of procedural due process do not generally apply to the non-renewal of a state-employed teacher's contract. The safeguards of due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment protections of "liberty" and "property." In other words, if loss of employment is accompanied by loss of liberty, the right to due process would accrue. And, if an individual can demonstrate a property right in continued employment, he or she is entitled to some form of prior administrative or academic hearing on the cause of such non-reemployment.

▉ In the school context, loss of liberty applies if and only if the school board in declining to hire a teacher, makes some charge against him that might seriously jeopardize or damage his standing and associations in the community. *Roth,* supra at 572, 92 S.Ct. 2701. See also: Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). There is no reference or suggestion in the present record that the Board levied any charge of moral corruption or disseminated any damaging rumor or gossip concerning plaintiff. Thus, plaintiff cannot avail herself of this judicially carved exception.

Furthermore, plaintiff has failed to substantiate a claim of a protectable property interest. Lewis v. Spencer, 468 F.2d 553 (5th Cir. 1972). In the academic setting, if a teacher has tenure, either contractual or *de facto,* then he or she possesses a legal proprietary interest. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Plaintiff, along with all classroom teachers in the District, was employed on the basis of a year-to-year contract, and therefore, lacked contractual tenure. The relevant teacher tenure policy is contained in the published "Policies and Regulations of the Board of Trustees, Chapt. VI, (II)C:

> Contracts for employees of Anahuac ISD shall be renewed each year.
> . . . . .

▉ Property interests, of course, are not created by the Constitution. They are created and their dimensions are defined by existing rules that stem from an independent source such as state law. The Texas statutes specifically repudiate any expectation of tenure for a probationary teacher such as plaintiff. V.T. Tex.Educ.Code § 13.103 et seq. (1972). Texas teachers are divided into two groups, those employed by a district for three years or less and those employed longer than three years. The first group has "probationary contracts with limited rights concerning termination"; the latter group has "continuing contracts" with established procedures for dismissal.

▉ Plaintiff was first employed on a permanent contractual basis in August, 1965 and dismissed by the District in April, 1968. Thus, she had "not been employed by such district for three consecutive school years *subsequent to August 28, 1967,*" and was, therefore, on probationary status. Tex.Educ.Code § 13.102 (1972). A district is free to refuse to retain a probationary teacher for the next school year so long as any dismissal of that teacher is not based upon constitutionally impermissive grounds. This Court is firmly of the opinion that a school board should be entirely unfettered to discharge any teacher without tenure which it considers to be unfit to teach. Bonner v. Texas City Ind. School Dist., 305 F.Supp. 600 (S.D. Tex.1969). Due process only contemplates that an individual be given an opportunity for a hearing before he is deprived of any significant property inter-

est. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Thus, it is not incumbent upon a school board to hold a hearing every time it determines not to renew the contract of a probationary teacher. Thaw v. Board of Public Institution of Dade County, Fla., 432 F.2d 98 (5th Cir. 1970). This is especially true when the termination of an employee is ostensibly for non-constitutional reasons and where the affected employee neither challenges the authenticity of these reasons nor requests a hearing.

 Despite lack of tenure plaintiff did enjoy a subjective "expectancy" of annual reemployment generated by prior periods of employment, but a mere unilateral expectancy of employment alone does not necessitate a hearing. Perry v. Sindermann, supra, at 603 of 408 U.S., 92 S.Ct. 2694. Plaintiff here made no assertion whatsoever that she had any legitimate claim or entitlement to job tenure. Neither has she alleged the existence of any rule or understanding promulgated or fostered by the District or any state official which would justify a claim of entitlement to continued employment. Perry v. Sindermann, supra. Therefore, she cannot now be heard to complain of violations of due process. Skidmore v. Shamrock Ind. School Dist., 464 F.2d 605 (5th Cir. 1972). Moore v. Knowles, 466 F.2d 531 (5th Cir. 1972).

 For all of the foregoing reasons, plaintiff was not denied procedural due process of law by the Board.

II. *Racial Discrimination*

 As found above, the decision not to renew plaintiff's contract was made on the basis of valid and legally unobjectionable criteria. Plaintiff was not rehired solely because the quality of her services did not attain the quality of performance demanded by defendant District. To make such a determination, her professional competence and proficiency were evaluated. An evaluation was appropriate and proper, the District being a creation of the State of Texas

and the State having the right to investigate the competency and fitness of those whom it hires to teach in its schools. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1961). The evaluative process employed by the District although subjected at trial to intensive theoretical criticism, proved to be consistent with common practice in Texas and to enjoy substantial support in the literature.

 Mindful that their ultimate goal should be quality education taught by the finest instructors available, secondary school boards should possess considerable latitude in all school matters for which they are responsible, including employment decisions. Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1957). Lack of specialized knowledge and experience counsels against premature judicial interference with the informed judgments made at the local level. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). This Court is and always has been reluctant to contravene or override the actions of a secondary school board in the broad exercise of its discretionary powers and functions. That courts should not interfere with or intervene in the daily operation of school systems is a platitudinous but eminently sound maxim. Shanley v. Northeast Ind. School Dist., 462 F.2d 960 (5th Cir. 1972). See also Karr v. Schmidt, en banc, 451 F.2d 1023 (5th Cir. 1971); Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Courts are not equipped by either training or experience to select and employ initially, or to select for reemployment or non-reemployment faculty or staff, or to order a school board to hire or rehire individual members of its faculty. Duke v. North Texas State Univ., 469 F.2d 829 (5th Cir. 1972). In such circumstances the judiciary is well advised to refrain from interposing on the states inflexible constitutional restraints that could circumscribe or handicap local control. Wright v. Council of the City of

Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). So long as a school board does not apply or follow unconstitutionally permissible considerations, permit race per se to be a factor for hiring, firing, or not rehiring, it should be free to improve and upgrade its faculty, even if in so doing members of a minority race may be disproportionately not hired, fired, or not rehired. Armstead v. Starkville Mun. Sep. School, 461 F.2d 276 (5th Cir. 1972).

The record here reflects that the District chose and utilized a combination of evaluative methods, in which all teachers in similar grade or subject matter were compared. There is no reason to suspect that the procedures used were less racially neutral than any other approach that might have been chosen. Except that it must be racially neutral, the Constitution does not mandate any particular philosophy of public school personnel management, or express a preference among the numerous methods of teacher evaluation.

However, evaluations incident to desegregation must be undertaken on a system-wide basis, whereby all teachers, black and white, are even handedly weighed against those similarly qualified for the available position. United States v. Jefferson County Board of Education, 372 F.2d 836, 900 (5th Cir. 1966), aff'd and modified en banc, 380 F.2d 385 (5th Cir. 1967) cert. denied sub. nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). Thus, the qualifications of all teachers in the system must be evaluated by racially neutral, rational standards, and any resulting dismissal or non-rehiring must be of the least qualified. The District in good faith compared plaintiff with each similarly-situated incumbent teacher in the system without regard to race and found the first grade teachers who were retained, to have had superior qualifications. The procedures established by the District administrators to insure that no teacher would be unfairly dismissed were fully adequate and constitutionally sound. Thus, refusal to rehire plaintiff was founded on constitutionally permissible reasons.

Also, personnel dislocation caused by desegregation must be reviewed in light of the guidelines enunciated in Singleton v. Jackson Municipal Sep. School District, 419 F.2d 1211 (5th Cir. 1970), cert. denied 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970). Singleton prescribed detailed procedures for the effectuation of staff reductions resulting from the judicially ordered desegregation of formerly dual public educational systems:

> If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

> Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

419 F.2d at 1218.

Admittedly, in the spring of 1968, the District had not promulgated, nor did it have available for inspection detailed written criteria otherwise promulgated, for the selection of teachers not to be rehired due to unitization of the faculty.

*Singleton* was handed down in January, 1970, while the non-renewal of plaintiff's contract occurred on April 8, 1968. The chronological hiatus raises the question whether or not *Singleton* applied retroactively. *Singleton's* retroactivity was considered in Lee v. Macon County Board of Education, 453 F.2d 1104 (5th Cir. 1971) where the Court concluded the specific procedures outlined in *Singleton* were not amenable to retroactive application. However, in Sparks v. Griffin, 460 F.2d 433 (5th Cir. 1972), two teachers whose dismissals were effectuated prior to the rendition of *Singleton*, were found to be entitled to reinstatement based on pre-*Singleton* law as amplified by *Lee*. The Court reasoned that the thrust of *Singleton* was substantive, in the sense that it stated the law as it substantively existed prior to 1970, and therefore susceptible to retroactive application. However, in applying *Singleton* ex post facto, the Court failed to observe one important caveat stated in *Lee*.

[*The Court*] *must take cognizance of the fact* that some school districts could conceivably have passed over, demoted or dismissed applicants of one race in order to hire applicants of another race whom the board, in good faith and without racial discrimination, considered "more qualified" than the earlier principals or teachers. That possibility is ". . . an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration." Chicot County Drainage District v. Baxter State Bank, 1940, 308 U.S. 371, 374, 60 S.Ct. 317, 319, 84 L.Ed. 329, 331 (Emphasis added.)

453 F.2d at 1113. Here, the District in good faith and without the slightest indication of racial motivation, terminated plaintiff while retaining the white first grade teachers who were found by comparison to be the better qualified. The District's actions with respect to plaintiff fall within the exception so clearly articulated by the Supreme Court in Chicot County Drainage District v. Baxter, supra.

Additionally, *Singleton* is inapplicable because the court-spawned faculty reduction at the heart of that case is not present here. Plaintiff's dismissal cannot be traced to a court-ordered school consolidation in furtherance of desegregation. As noted in Finding of Fact 6, when the time had clearly come, the District voluntarily unitized its public school system. There was never a hint or threat of judicial compulsion or entry of a court order to accelerate desegregation. Rather, at every juncture, the District acted promptly, prudently and voluntarily.

Since *Singleton* is inapplicable, lawful reasons for the discharge or non-rehiring of a public school instructor embrace a wide range of teacher conduct, especially if the teacher, like plaintiff, is not tenured and has no reasonable expectation of reemployment. Consequently, if the school district has no tenure system, the school board's refusal to rehire such teacher for *whatever reason* would be justified, because such teachers would have no prospect of continuous employment from one school year to the next. Thompson v. Madison County Board of Education, 476 F.2d 676 (5th Cir. 1973).

In all areas of employment, courts have long recognized that the decision to hire, rehire or fire an employee is in large part a subjective determination. The Fifth Circuit Court of Appeals acknowledged this fact in the teacher dismissal case of Fluker v. Alabama State Board of Education, 441 F.2d 201, 207 (5th Cir. 1971) where the Court said

that nonreappointment of an employee may be justified by highly subjective considerations. The individual qualifications, capabilities and abilities of each teacher must be considered, and known capabilities cannot be reduced to a mathematical or mechanical formula. Individual factors, such as personality, disposition, industry and adaptability vitally affect the work of any teacher. Fitness for teaching depends on a broad range of factors. Beilan v. Board of Public Education, supra at 406 of 357 U.S., 78 S.Ct. 1317. What constituted professional competence or incompetence has no easily ascertainable boundaries. What objective criteria are appropriate and necessary to judge professional competence or incompetence is likewise incapable of exact delineation. In most desegregation cases, courts have used the word "objective" to mean non-arbitrary, non-capricious and racially non-discriminatory. The District's evaluative system viewed from this stance, was clearly objective in that it was developed and administered free of bad faith, improper motive or racial motivation. The Court concludes, therefore, that the method of evaluation and comparison used by the District was fairly conducted by qualified professionals acting in a professional manner, who were not motivated or influenced by impermissible racial considerations. Smith v. Board of Public Instruction of Pinellas County, 438 F.2d 1209, 1210 (5th Cir. 1971).

Plaintiff's dismissal was based upon non-discriminatory standards applied in a non-discriminatory manner. Therefore, the Court finds and concludes that race played no part, directly or remotely, in the Board's determination not to continue plaintiff's services.

To the extent that any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.